**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **RODI MARINE, LLC and** | § | **CIVIL ACTION NO. 3:22-cv-00403** |
| **BOAT SERVICES OF** | § | |
| **GALVESTON, INC.** | § | |
| *Plaintiffs* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **LIGHTHOUSE MARINE, LLC and** | § | |
| **PENINSULA MARINE, INC.** | § | **MAGISTRATE JUDGE** |
| *Defendants* | § | **HON. ANDREW M. EDISON** |

**DEFENDANTS LIGHTHOUSE MARINE, LLC AND PENINSULA MARINE, INC.'S**
**PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Defendants Lighthouse Marine, LLC and Peninsula Marine, Inc. (collectively, "Defendants") submit the following Proposed Findings of Facts and Conclusions of Law for consideration and adoption by this Honorable Court:

**FINDINGS OF FACT**

The following facts were established by a preponderance of the credible evidence presented at trial on this matter:

**I.      General Background**

1.      Defendant Lighthouse Marine, LLC ("Lighthouse") owns and operates a shipyard in Port Bolivar, Texas, that provides onshore and afloat repair and docking services to medium-sized watercraft. The shipyard has the ability and equipment to haul vessels out of the water and place them on blocks in its yard where the vessels can then undergo repairs or refurbishment on land. The yard is surrounded on its north and east sides by canal waters; an entry gate protects its west entrance; and wire fencing was installed on its north boarder. To gain access, visitors and contractors that perform work at the yard check in with an office and then enter the west-side gate

to the yard. The gate to the yard is locked at the close of business hours every day, usually around 6pm. Security cameras monitored Lighthouse's yard on a 24-hour basis.

2.　　On or around August 22, 2022, Plaintiff Rodi Marine LLC brought the 134-ft MS MONICA crew boat to Lighthouse's yard for repairs following an incident where the MS MONICA became grounded on jetties near Galveston, Texas. Based on a services price sheet provided by Lighthouse to Rodi, Lighthouse agreed to haul the MS MONICA out of the water, block it on land at Lighthouse's yard, and provide shore power to the vessel. Lighthouse and Rodi understood that a third-party contractor retained by Rodi and not affiliated with Lighthouse would perform repairs on the MS MONICA.

3.　　On or around October 11 or 12, 2022, Intervenor Jubilee Sailing, LLC brought its 97-ft wooden hull sailboat NINO to Lighthouse's yard for repair and refurbishment. Based on a services price sheet provided by Lighthouse to Jubilee, Lighthouse agreed to haul the NINO out of the water, block it on land at Lighthouse's yard, and provide shore power to the vessel. Lighthouse and Jubilee understood that third-party contractors retained by Jubilee and not affiliated with Lighthouse would perform services on the NINO.

4.　　The MS MONICA and NINO were blocked next to each other, around 30-35 feet apart, at the south-southeast corner of Lighthouse's yard. Contractors retained by Rodi and Jubilee performed work on their respective vessels every day that the yard was open.

5.　　On the evening of October 22, 2022, around 8:30pm, several unidentified individuals entered Lighthouse's yard and set fire to the NINO. The closest fire department was dispatched at 8:48pm and arrived at 8:52pm, but the fire took several hours to extinguish. Prevailing winds at this time spread the fire to the MS MONICA.

6.　　The Galveston County Sherrif's Office concluded that the fire was an arson event. There is no evidence that suggests Lighthouse itself was the target of the arson event. Lighthouse's

office building, storage facilities, tools, equipment, electrical, water, and other systems were left unaffected, as were other third-party vessels positioned in other areas of the shipyard on the night of the fire. No other vessels were affected by the fire, and no third party-owned property was stolen or otherwise affected. It is not known where or how the arsonists entered Lighthouse's yard. It appears clear that the NINO was the target of the arson event.

7.     Prior to this event, Lighthouse's shipyard had never experienced arson, vandalism, pilferage, theft, or similar criminal activities. No evidence was presented of criminal activity, arson or otherwise, affecting businesses and/or residences located in the Port Bolivar area surrounding the Lighthouse shipyard prior to the fire.

8.     Following the fire, the NINO and MS MONICA were declared total losses.

9.     Prior to the fire, neither Rodi or Jubilee discussed with Lighthouse any requirements, complaints, or concerns concerning vessel spacing in the shipyard, security at the shipyard, or fire response available at or to the shipyard. Rodi and Jubilee maintained control over their vessels while present at the shipyard. Lighthouse did not have access or permission to board the vessels or complete any work on the vessels aside from the limited services previously agreed upon. Rodi and Jubilee vetted and hired third-party contractors to complete work on their respective vessels. Rodi and Jubilee retained keys to their vessels, and their contractors and representatives always had access to the vessels for any purpose, including making repairs, inspecting the vessels, and completing work.

10.     Following the fire, Lighthouse was not cited for any wrongdoing or violations by any fire department, sheriff's department, arson investigator, the United States Coast Guard, or Department of Homeland Security.

## II.    Facts specific to Rodi and the MS MONICA

11.    On March 1, 2022, Rodi and Talos Production Inc. ("Talos") entered a Master Time Charter that allowed Rodi to perform certain vessel-related services for Talos' offshore oil and gas operations. The Master Time Charter states that "[n]othing in this Agreement shall be construed as creating a demise or bareboat charter of any Vessel to [Talos]". The Master Time Charter does not obligate any party to act, does not bind Talos to any vessel in Rodi's fleet, and states that Talos may cancel any vessel hired from Rodi at any time and for any reason.

12.    In early June 2022, Rodi's principals learned that the MS MONICA was for sale or charter and contacted Plaintiff Boat Services of Galveston, Inc. ("BSOG"), the vessel's owner, to express interest in the vessel. The MS MONICA had been out of service and "stacked" in the Galveston/Freeport area for approximately two years prior to Rodi's interest. BSOG's representative testified that the MS MONICA had been on the sales market for almost a year prior, for the price of $2,500,000, but that it had not received any interested from buyers.

13.    On June 24, 2022, Rodi and BSOG executed a Bareboat Charter Agreement (the "BCA") for the MS MONICA. Initially, the BCA was for a period of one year and contained extension capabilities and a purchase option. Under the terms of the BCA, the charter hire for the MS MONICA was $10,000 per month, with a purchase option price of $2,200,000.00, less credits or offsets. To maintain viability of the purchase option, the BCA required Rodi to escrow a non-refundable amount of $200,000 per year with BSOG. If the purchase option was exercised, this escrow amount would be applied to the purchase price, as would $2,000 of each $10,000 of charter hire paid prior to Rodi exercising the option. Rodi paid BSOG the first year's escrow amount.

14.    The BCA also required Rodi to carry and fund Hull, P&I, and other insurance on the vessel. Rodi and BSOG agreed to value hull insurance at $2,500,000 and the policy was to name BSOG as "loss payee" and "additional assured" for any losses. Rodi obtained Hull and P&I

4

insurance through a series of two policies issued to Rodi: a base policy with a vessel hull value of $1,750,000, and an increased value policy of $750,000; both base policy and increased value policy were properly endorsed to protect the interests of BSOG.

15.     Approximately five days after execution of the BCA, Rodi sailed the MS MONICA to Superior Shipyard in Golden Meadow, Louisiana for repairs and USCG certification. On August 5, 2022, the MS MONICA left Superior Shipyard and began working for Talos pursuant to the Master Time Charter at the rate of $5,800 per day (Talos also paid for fuel). The work for Talos was completed on an "as needed" basis and there was no long-term "notice of hire" in place, nor were Rodi and Talos negotiating such a long-term hire. The MS MONICA work for Talos involved running personnel between assorted shore bases and platforms in the West Cameron and High Island offshore blocks.

16.     On August 17, 2022, after going "off hire" for Talos, the MS MONICA ran aground on the Galveston Jetties. The vessel sustained significant damage to her forepeak and surrounding areas.

17.     The vessel was picked up by a salvage operator and eventually moved to the Lighthouse shipyard for further assessment and repair, arriving August 22, 2022.

18.     In total, the MS MONICA was in commercial service for Talos approximately twelve days during the BCA term. No evidence was presented that Talos intended to continue using the MS MONICA following the grounding, nor was there any agreement—long-term or otherwise—that was interrupted or breached by the grounding. The MS MONICA did not perform any work for any other entities during the BCA term other than the twelve days for Talos.

19.     Rodi hired D&A Welding to complete hull repairs on the vessel while it was on blocks in Lighthouse's yard. Lighthouse did not perform any repairs on the vessel. Once D&A completed its welding work, and shortly before the arson event, Rodi hired Lighthouse to sandblast

5

some newly-welded areas on the hull and some rust spots on the main deck of the vessel. However, Lighthouse did not conduct any "hot work" on the vessel at any time. Once sandblasting was completed, Lighthouse painted part of the repaired area at the bow and was scheduled to complete this work had the fire not occurred. No other services were requested by Rodi or provided by Lighthouse before the fire.

20.     The MS MONICA's captain retained the keys to the vessel, stored items on the vessel, and attended the vessel every day while it was in Lighthouse's yard. Rodi's COO and other employees visited the vessel in Lighthouse's yard to review work progress. No one from the Rodi side expressed concern about yard security.

21.     After the fire, Rodi and BSOG entered negotiations regarding compensation to BSOG for the total loss of the MS MONICA. Rodi's CFO, Jody Jarrell, decided not to make a claim under Rodi's hull policy for the loss of the vessel. Had a claim been made, it is likely that Rodi's hull underwriter would have paid BSOG $2,500,000 for the total loss of the vessel, as BSOG was the loss payee under Rodi's policy. Instead, Rodi and BSOG negotiated a separate Release and Assignment Agreement ("RAA") to settle any outstanding claims between those two parties. The RAA states that disputes arose between Rodi and BSOG regarding ownership interest in the vessel, entitlement to hull insurance proceeds and "in other regards" not specified. Rodi agreed to pay BSOG $2,250,000 in cash to acquire title to the vessel (despite its status as a total loss) and to acquire any claim BSOG may have against any party arising out of the subject fire.

22.     To fund the cash purchase made in the RAA, Rodi entered into a promissory agreement with an individual named Andre Clemons (a friend of Mr. Jarrell) for $2,000,000. The loan required that Rodi make quarterly interest payments to Mr. Clemons, at a 6% interest rate, until November 2027. Rodi's potential recovery from this lawsuit was used as collateral for the

loan. Rodi's CFO testified that payments made to Mr. Clemons precluded Rodi's ability to make any new capital expenditures to benefit the company.

23.     At the time of trial, Rodi had not chartered or purchased another vessel to replace the MS MONICA in its fleet, nor had Rodi began searching for a replacement vessel.

24.     BSOG's representative testified that BSOG had been made whole by Rodi's purchase of the MS MONICA through the RAA and that it does not have any colorable claim against Defendants in this suit.

## III.   Facts specific to Jubilee and the NINO

25.     Jubilee is operated by non-party Tantum Business SA de CV ("Tantum"), a Mexican business entity engaged in commercial and residential real estate development, finance, and other business interests. Jorge Gastelum is a partner of Tantum and Marlene Reynaud is its Administrator of Properties.

26.     In Spring 2021, Reynaud located the NINO in Freeport, Texas (at this time, the vessel was known as the JUBILEE). At this time, Jubilee Sailing, LLC owned the vessel but Tantum did not yet own Jubilee. Reynaud had the vessel surveyed in June 2021—both ashore and afloat—by Drake Epple of Perry's Marine, a Rockport-based surveyor. Perry's Marine did not extensively examine the vessel's wooden hull or its hull ribbing to determine whether any damage existed due to wood rot, termites, or other issues that commonly arise in wooden-hulled vessels. Mr. Epple noted areas on the vessel that required repair or rehabilitation, but did not provide any substantive opinions on the hull itself or the interior of the hull.

27.     Following the Perry's Marine inspection, Tantum acquired a 100% interest in Jubilee Sailing, LLC, which held a 100% interest in the NINO, for $275,000. The post-acquisition members of Jubilee included, among others, Gastelum and Reynaud. Jubilee then hired Reynaud as its general manager to purchase and rehabilitate the NINO. The NINO was a "pet project" of

Gastelum, who desired to purchase and use a wooden hull sailboat for private pleasure/non-commercial purposes.

28.     Immediately post-purchase, the NINO was left in the Aransas Marine Ways shipyard in Aransas Pass, Texas for assorted maintenance and repairs. The vessel remained in Aransas Pass for approximately the next eight months. The work performed in Aransas Pass included engine overhauls and significant specialized wood working on the top sides interior of the vessel.

29.     The NINO encountered engine problems on its first voyage from Aransas to Galveston. The vessel then remained in Galveston for roughly three weeks undergoing repairs. While in Galveston, Gastelum attended the vessel for one day.

30.     After engine repairs, the NINO departed Galveston and ventured east. Gastelum intended to meet the NINO in Florida and then sail to the Caribbean. However, the vessel ran into a storm before reaching Port Fourchon, Louisiana, and had to be assisted to port by the USCG. The vessel was damaged in the storm and remained in Fourchon for roughly two months while undergoing repairs.

31.     The NINO then reversed course and returned to Galveston, arriving on June 19, 2022. Significant hull leaks were discovered, and the bilges had to be pumped constantly during this voyage. It was determined that the boat needed extensive below-waterline repairs before proceeding on any long-distance voyages. An advisor hired by Reynaud suggested that the boat be hauled out at Lighthouse's shipyard in Port Bolivar for a more complete bottom inspection. Haul out and blocking ashore occurred at Lighthouse on or about June 20, 2022. A third-party contractor retained by Jubilee conducted spot repairs to the hull, but Jubilee decided to defer more permanent repairs until a later time. Reynaud/Jubilee's third-party contractor encouraged her to return the

NINO to the water in the interim to prevent the wooden seams of the hull from drying out and separating further.

32.     Once spot repairs were completed, the vessel was placed back into the water at the end of June 2022 and taken to the Galveston Yacht Basin where she remained for roughly two and a half to three months. During this time, Reynaud retained yet another third-party contractor to re-wire the vessel and its electronics. In addition, Reynaud commissioned other third-party contractors to perform extensive woodwork on the main deck and interior cabins of the boat. At this time, Reynaud and Jubilee had still not inspected the hull or hull ribbing to determine their condition or the overall structural integrity of the hull.

33.     On or around October 11 or 12, 2022, the NINO left the Galveston Yacht Basin and was again hauled out and placed on blocks in the Lighthouse yard, in virtually the same position it had occupied in June 2022. While at Lighthouse in October 2022, Reynaud hired a different contractor to perform work on the hull, hired contractors to install a new generator, and continued re-wiring the vessel's electrical system.

34.     The bottom work commenced after the boat was hauled out and blocked. The first step was to sand off all paint/coating on the hull circumference below the waterline to assess the hull's condition. The next step was to remove horizontal side planking around the circumference of the hull from the waterline down. Photos of the now exposed internals of the boat were taken during this process and revealed extensive rotting of the hull and internal support frames and potential termite damage. Jubilee's third-party contractors began the process of removing side planking, reinforcing or replacing hull ribbing, and repairing the hull.

35.     Light work was conducted on the NINO during the day of the fire (Saturday, October 22, 2022) and Reynaud was present at the shipyard until noon. She then departed to Houston with one of her assistants in search of additional supplies. Another Jubilee assistant

remained at the yard and oversaw locking the boat. The yard closed early (mid-afternoon) and the main gate was locked once all Lighthouse and third party contract personnel left.

36.     At the time of the fire, the NINO was not seaworthy and was incapable of being safely sailed on any voyage, extended or otherwise. The vessel's entire hull structure and internal ribbing needed to be replaced, as the existing hull and ribbing showed signs of extensive rot and termite damage, and was in the process of being replaced at the time of the fire. The vessel also needed electrical, plumbing, and top sides fabrication work before it could sail as intended.

37.     Throughout Jubilee's ownership of the NINO, its principal investor, Gastelum, was present onboard the vessel for only one day prior to the fire. At the time of trial, Jubilee had not chartered or purchased another vessel to replace the NINO.

38.     Jubilee's representatives testified that they did not know why the NINO was targeted by arsonists.

39.     The NINO was uninsured at the time of the loss.

## CONCLUSIONS OF LAW

**I.      Jurisdiction**

1.      Rodi and BSOG (the "Rodi Plaintiffs") eventually sued Lighthouse. Their original complaint was brought pursuant to general maritime law within the meaning of Federal Rule of Civil Procedure 9(h), and their complaint contained a 9(h) designation.[1] The Rodi Plaintiff's original complaint states: "[s]ubject matter jurisdiction exists because the claims asserted in this lawsuit arise out of the damages to and/or loss of the M/V MS MONICA, a vessel in navigation, and because the damage to the M/V MS MONICA arose out, and involves a claim for, *inter alia*, the breach of a maritime contract for vessel repair."[2] The original complaint alleges Lighthouse is

---

[1] Dkt. 1.
[2] Dkt. 1 at ¶ 4.

liable for the loss of the MS MONICA under theories of breach of maritime contract, breach of the implied warranty of workmanlike performance, bailment, and negligence.[3]

2. The Rodi Plaintiffs later filed a First Superseding and Amended Complaint for Compensatory and Punitive Damages (the "Amended Complaint").[4] The Amended Complaint does not contain an explicit reference to Rule 9(h), but the Rodi Plaintiffs admit that the Court has jurisdiction under 28 USC § 1333.[5] Texas law is never invoked in the Amended Complaint, but the Rodi Plaintiffs reference that a court sitting in admiralty has supplemental jurisdiction over state law claims under 28 USC § 1367. The Amended Compliant then states:

> The fault of Lighthouse includes, without limitation, (a) placing the S/V NINO too close to the M/V MS MONICA; (b) inadequate supervision of the work being performed on the sailboat; (c) inadequate attention to and supervision of the vessels under its bailment; (d) inadequate fire watch and fire response; (e) inadequate workmanship; and (f) other fault that will be proven at trial.[6]
>
> Lighthouse was the bailee of the M/V MS MONICA at all relevant times.[7]
>
> Lighthouse's conduct was a breach of the terms of the contract between plaintiff, Rodi Marine, LLC and Lighthouse, including but not limited to the implied warranty of workmanship present in all maritime contracts for repair of vessels.[8]
>
> The loss of the M/V MS MONICA has occasioned damages to plaintiffs as their interests may appear, including but not limited to (a) lost charter hire; (b) lost revenue; (c) damages for the repair cost of the M/V MS MONICA and/or the value of the M/V MS MONICA; and (e) clean-up costs; along with interest and costs.[9]

3. Jubilee eventually intervened in the suit. Its complaint in intervention states that "[t]his is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of

---

[3] *Id.* at ¶ 8.
[4] Dkt. 22.
[5] *Id.* at ¶ 1.
[6] *Id.* at ¶ 9.
[7] *Id.* at ¶ 11.
[8] *Id.* at ¶ 12.
[9] *Id.* at ¶ 13.

Civil Procedure. The Court has jurisdiction over this matter pursuant to 28 USC § 1333."[10]

Jubilee's live complaint states:[11]

> The fault and negligence of Lighthouse includes, without limitation, (a) inadequate attention to, security, and supervision of the S/V NINO which was under its bailment; (b) inadequate fire watch and inadequate fire response; (c) inadequate workmanship; and (d) other fault that will be proven at trial.[12]

> Lighthouse was the bailee of the S/V NINO at all relevant times.[13]

> Lighthouse's conduct was a breach of the terms of the contract between Intervenor Plaintiff Jubilee Sailing, LLC and Lighthouse, including but not limited to the implied warranty of workmanship present in all maritime contracts for security and repair of vessels and other maritime service contracts. Further, Lighthouse's (1) breached the implied warranties of workmanlike performance in the oral contract; (2) negligently breached the duty of care owed by a shipyard to vessels on its premises like the S/V NINO, and (3) breached the terms of the bailment. All such breaches proximately, or otherwise, caused damages to the S/V NINO and Plaintiff Intervenor herein for which it seeks recovery.[14]

> The loss of the S/V NINO has occasioned damages to Intervenor Jubilee Sailing, LLC. These damages include, but are not limited to, all foreseeable losses caused by the breach, including (1) loss of pleasure, use, and enjoyment of the vessel, (2) damages to, including the full value of, the S/V NINO (3) clean-up costs, and (4) attorney's fees, expenses, interest, and costs.[15]

4.      While desirable, an express invocation of a 9(h) claim is not necessary when a complaint otherwise contains a simple statement identifying the claim as one in admiralty or maritime law.[16] "A plaintiff who asserts admiralty jurisdiction as a basis for the court's subject matter jurisdiction over a claim has automatically elected under Rule 9(h) to proceed under the admiralty rules."[17]

---

[10] Dkt. 15 at ¶ 1.
[11] Unlike the Rodi Plaintiffs, Jubilee never amended its complaint.
[12] *Id.* at ¶ 7.
[13] *Id.* at ¶ 8.
[14] *Id.* at ¶ 9.
[15] *Id.* at ¶ 10.
[16] *Rosales v. Bouchard Coastwise Mgmt. Corp.*, No. Civ. A. 03-2978, 2004 WL 1146953, at *1 (E.D. La. May 19, 2004).
[17] *Luera v. M/V Alberta*, 635 F.3d 181, 189 (5th Cir. 2011).

5. Admiralty is the sole basis of subject-matter jurisdiction over the Rodi Plaintiffs' claims[18] and Jubilee brings its claims pursuant to an explicit designation of Rule 9(h) jurisdiction.[19] The Rodi Plaintiffs' removal of any explicit reference to Rule 9(h) in the Amended Complaint does not, however, remove an admiralty designation because the Amended Complaint is replete with statements that continue to invoke maritime jurisdiction, and the sole jurisdictional pleading remained pursuant to 28 U.S.C. § 1333.[20] The Court finds that it has jurisdiction over the claims made in this suit.

6. The Court's jurisdiction over the Rodi Plaintiff's state law negligence claim is supplemental to its maritime jurisdiction.[21] A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state in which it sits.[22]

## II. Breach of Contract and the Implied Warranty of Workmanlike Performance

7. Rodi and Jubilee both allege that Lighthouse breached a maritime contract as well as the warranty of workmanlike performance present in all maritime contracts.

8. "Unless excluded by agreement, all maritime service contracts include an implied warranty of workmanlike performance."[23] The warranty of workmanlike performance binds the ship repairer to use that degree of diligence, attention, and skill which is adequate to complete the task.[24] "To recover from a contractor for breach of an implied warranty of workmanlike performance, a shipowner must prove that the contractor breached the warranty, and that the breach proximately caused the injury."[25] "The implied warranty of workmanlike performance is breached

---

[18] Dkt. 22, ¶ 1.
[19] Dkt. 15, ¶ 1.
[20] Dkt. 22, ¶ 1.
[21] 28 U.S.C. § 1367(a).
[22] *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 353 (5th Cit. 1989) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938)).
[23] *Cont'l Ins. Co. v. Bollinger Quick Repair, LLC*, No. 18-2810, 2021 WL 1313406, at *2 (E.D. La. 2021) (Barbier, J.) (citing *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 416 (5th Cir. 1982).
[24] 1 Admiralty & Mar. Law, Thomas J. Schoenbaum, § 5:14 (6th ed.).
[25] *Butterfly Transp. Corp. v. Bertucci Indus. Servs., LLC*, 351 F. App'x 855, 858 (5th Cir. 2009) (citing *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 302 (5th Cir. 1973)).

where a contractor fails to perform his obligation properly and safely."[26] Where a contractor "properly performs the 'essence' or 'inescapable elements' of a contract, no cause of action for breach [of the implied warranty of workmanlike performance] will lie."[27] "An obligor generally complies with the WWLP when he uses reasonable care in the performance of the obligation."[28]

9.      "Plaintiff must show negligence and causation by a preponderance of the evidence."[29] Plaintiffs must put the Court in a position to determine whether it is more probable than not that the alleged faulty repairs caused the alleged damages.[30] "In practice, the standard need not differ from the test for ordinary maritime negligence."[31] "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury."[32] "The requirements of causation and foreseeability still apply to claims under the WWLP."[33] A contractual agreement to provide services—whether written or oral—is a prerequisite to establishing a claim for a breach of the implied warranty of workmanlike performance.[34]

### A.      Rodi/MS MONICA

10.      Pursuant to the quote for services provided to Rodi, the contractual services provided by Lighthouse were limited to hauling the MS MONICA out of the water, blocking the

---

[26] *Penn Maritime, Inc. v. Rhodes Electronic Servs., Inc.*, 41 F. Supp. 3d 507, 516 (E.D. La. 2014) (citing *Butterfly Transp. Corp.*, 351 F. App'x at 858).

[27] *Id.*

[28] *Id.*; *see also B&B Schiffahrts GmbH & Co. v. Am. Diesel & Ship Repairs, Inc.*, 136 F. Supp. 2d 590, 597 (E.D. La. 2001) ("'The obligor in a service contract has a duty to perform his or her task with reasonable care, skill, and diligence.'") (quoting *Caribbean Bulk Carriers, Ltd. v. Motor-Services Hugo Stamp, Inc.*, 1996 WL 210716, *3 (E.D. La. Apr. 26, 1996).

[29] *See Marquette Transportation Co. v. Louisiana Machinery Co.*, 367 F.3d 398, 402 (5th Cir. 2004).

[30] *See, e.g., id.*

[31] *Penn Maritime, Inc. v. Rhodes Electronic Servs., Inc.*, 41 F. Supp. 3d 507, 516 (E.D. La. 2014).

[32] *Rose Crewboat Servs., Inc. v. Wood Resources, LLC*, 425 F. Supp. 3d 668, 675-76 (E.D. La. 2019) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

[33] *Penn Maritime, Inc.*, 41 F. Supp. at 516.

[34] *See, e.g., Butterfly Transp. Corp.*, 351 Fed. Appx. at 858.

MS MONICA onshore at Lighthouse's yard, providing space for the MS MONICA in the shipyard, and providing shore power to the MS MONICA. In addition to the limited services included within the four corners of the quote, Rodi later requested that Lighthouse provide sandblasting and painting services for the MS MONICA. Other than these services, Lighthouse did not provide any repairs to the MS MONICA or perform any work on the MS MONICA prior to the fire. All other work performed on the vessel was conducted by third parties hired by Rodi.

11.     Rodi did not present sufficient evidence that the contractual services performed by Lighthouse were completed improperly, unsafely, unreasonably, or that Lighthouse's performance of these services proximately caused the fire or resulting loss. It is Rodi's burden to establish that it is more probable than not that the *faulty repairs or services* complained of and subject to the contract resulted in the alleged damages.[35] The evidence presented at trial did not support Rodi's breach of warranty claim, and the Court finds that Lighthouse is not liable to Rodi under any breach of contract or breach of the warranty of workmanlike performance theory.

### B.     Jubilee/NINO

12.     Lighthouse, in accordance with the price sheet for services sent to Jubilee, agreed to haul the NINO out of the water, block it in Lighthouse's yard, provide space for the NINO, and provide shore power to the NINO. Lighthouse successfully completed these tasks without incident. Lighthouse did not agree to and did not perform any repair work on the NINO. Jubilee did not produce sufficient evidence that the limited services provided by Lighthouse were performed unreasonably or that the services resulted in the fire or total loss. The Court finds that Lighthouse is not liable to Jubilee for any breach of contract or breach of the warranty of workmanlike performance theory.

---

[35] *See Marquette Transportation Co.*, 367 F.3d at 402.

15

13.     To the extent Plaintiffs maintain the Lighthouse quotes and/or services included an inferred or inherent duty to prevent an arson event, such argument is misplaced and mischaracterizes the requirements of an implied warranty claim. The threshold issue involved in evaluating and proving a claim for breach of the implied warranty of workmanlike performance is whether the *contractual services proximately caused the damage*.[36] Therefore, the Court's analysis is limited to those services contained within the four corners of the contract—if any—and not what Plaintiffs want to now read into or extrapolate from the contracts. To the extent the Plaintiffs maintain the contract inferred a duty upon Lighthouse, that is a negligence issue, not a claim arising out of an implied warranty of workmanlike performance.

14.     Attorneys' fees are not recoverable for a claim of breach of the implied warranty of workmanlike performance.[37]

## III.     Bailment

15.     In general, both Plaintiffs argue that Lighthouse is liable for their losses because their vessels were damaged while in Lighthouse's possession. Plaintiffs contend this necessitates a bailment cause of action.

16.     Rodi argues that its bailment claim arises under Texas law, but its argument for application of Texas law is unconvincing. Any bailment relationship between Plaintiffs and Lighthouse necessarily arises out of Lighthouse's contractual agreement to haul their vessels out of the water and provide storage space for the vessels. This agreement is maritime in nature,[38] which would make a bailment agreement also maritime in nature. However, maritime bailment law and Texas bailment law are not so dissimilar to affect the overall claims made by Plaintiffs

---

[36] *See id.*

[37] *See Nathaniel Shipping, Inc. v. General Elect. Co.*, 920 F.2d 1256 (5th Cir. 1991).

[38] *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23-24, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004); *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S.119, 128, 39 S.Ct. 221, 63 L.Ed. 510 (1919); *see also Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348-49 (11th Cir. 1994) (holding that a ship in a dry dock is "in or on navigable waters for purposes of admiralty jurisdiction.").

against Lighthouse. The issue of what law applies on bailment is not dispositive to the Court's conclusions.

17.     Under general maritime law, a contract for the storage or repair of a vessel constitutes a bailment agreement.[39] The law of bailment is applicable in suits for damages to a vessel that has been left with another for the purpose of repairs.[40] The Fifth Circuit has defined bailment as:

> A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.[41]

The burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in the bailee's possession, the bailor makes a *prima facie* case of negligence.[42] A bailee is liable for damage to the property resulting from its negligence.[43]

18.     Under general maritime law, bailment does not arise unless delivery to the bailee is complete and the bailee has exclusive possession of the bailed property, even as against the property owner.[44] No inference or presumption of negligence can arise against a bailee if its possession of the damaged property was not exclusive to that of the bailor.[45] Where both parties have equally unrestricted access to the vessel at all times, there is no basis for an inference of negligence.[46]

---

[39] *See Snyder v. Four Rinds Sailboat Centre, Ltd.*, 701 F.2d 251, 252 (2d Cir. 1983); *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 385 (D. Conn. 1994).

[40] *Buntin v. Fletchas*, 257 F.2d 512, 513 (5th Cir. 1958).

[41] *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) (cleaned up).

[42] *Stegemann v. Mia. Beach Boat Slips*, 213 F.2d 561, 564 (5th Cir. 1954).

[43] *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 147 (E.D.N.Y. 2006) (quoting *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991)).

[44] *Thyssen Steel Co. v. M/V Kavo Yerakas*, 50 F.3d 1349 (5th Cir. 1995).

[45] *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 19 (1st Cir. 1991) (citing *United States v. Mowbray's Floating Equipment Exchange*, 601 F.2d 645 (2d Cir. 1979).

[46] *Id.*

19.     In Texas, courts consider the following elements when determining whether a bailment relationship exists: (1) the delivery of personal property from one person to another for a specific purpose; (2) acceptance by the transferee of such delivery; (3) an agreement that the purpose will be fulfilled; and (4) an understanding that property will be returned to the transferor.[47] When exclusive possession has not been delivered and control and dominion of the property is dependent in no degree upon to co-operation of the owner of the premises, a landlord and tenant relationship is created, not a bailment.[48] A bailee has the duty to exercise ordinary care over goods delivered within its exclusive dominion and control for a specific purpose, whereas a lessor has the duty of ordinary care in maintaining the premises it controls, with no duty regarding a lessee's property stored on the premises.[49] For a bailment relationship to exist, the property owner must prove it delivered personal property to another in trust for a specific purpose that will be carried out by the bailee.[50] Where the property owner merely rents space from the premises owner and leaves personal property on that space without surrendering control and dominion of the personal property to the premises owner, a bailment relationship has not been created, and the premises owner owes only the duty of a lessor.[51]

20.     When the presumption of negligence in a bailment claim is overcome, a bailment cause of action folds into a general negligence cause of action.[52]

21.     Rodi and Jubilee have not exhibited that a bailment relationship was formed with Lighthouse. The evidence conclusively showed that Plaintiffs never relinquished control of the

---

[47] *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 462 (Tex. App.—Dallas 2006, pet. denied).

[48] *Sisters of Charity of the Incarnate Word v. Meaux*, 122 S.W.3d 428, 431-32 (Tex. App.—Beaumont 2003, pet. denied).

[49] *Id.* at 432 (citing *Marine Indem. Ins. Co. of America v. Lockwood Warehouse & Storage*, 115 F.3d 282, 286 (5th Cir. 1997).

[50] *Id.* at 431.

[51] *Id.* at 431-32; *Lockwood Warehouse*, 115 F.3d at 286.

[52] *See Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322 (5th Cir. 1962) (stating that once a bailee overcomes the presumption of negligence in a bailment claim by coming forward with evidence sufficient to show it exercised ordinary care, "the burden of going forward would shift back to [the bailor] to ultimately persuade the trier of fact of the facts of negligence[.]").

vessels to Lighthouse and that Lighthouse never took control of the vessels. Rather, the testimony of witnesses and parties involved established that Plaintiffs maintained control over the vessels. Lighthouse was not providing substantive repairs to the vessels, did not hire contractors, did not supervise or direct any work performed on the vessels, did not have access to the vessels, and neither Plaintiffs nor their contractors were limited or otherwise restricted from accessing and/or repairing the vessels, even overnight or outside normal operating hours.

22.    Accordingly, the Court finds that Rodi and Jubilee did not have a bailment relationship with Lighthouse and, therefore, Lighthouse is not liable for Plaintiffs' losses under a bailment cause of action.

23.    Further, even if a bailment relationship existed, Lighthouse overcame Plaintiffs' rebuttable presumption because the evidence established Lighthouse exercised ordinary care in securing its yard and protecting it from fire. The standard for a bailee's responsibility in responding to and/or extinguishing a fire is that of a reasonable person under similar circumstances.[53] Negligence does not lie in the case of a vessel fire at a shipyard where the bailee takes responsive action, including telephoning for assistance and attempting to save whatever property possible.[54] The absence of fire prevention devices, including, but not limited to, a nightwatchman, a fire alarm system, fire walls, or a sprinkler system, does not automatically constitute negligence on the part of a bailee.[55] While it is possible a nightwatchman or other fire prevention device could have detected and/or prevented the arsonists from entering the property and setting the vessels ablaze, it is equally possible that the fire could have been started without being noticed by any security or detected at a time when efforts to save the vessels would have been successful.[56]

---

[53] *Id.*
[54] *Id.*
[55] *Niagra Fire Ins. Co. v. Dog River Boat Serv., Inc.*, 187 F. Supp. 528, 532 (S.D. Ala. 1960).
[56] *See id.* at 20.

24.     The evidence also established Lighthouse had security measures in place to protect its yard, including fencing, locked gates, and security cameras. Plaintiffs argue Lighthouse should have taken additional steps to secure the shipyard. However, Plaintiffs failed to produce any evidence that allowed the Court to evaluate whether or not the presence of any additional security measures could have prevented the arsonists from entering Lighthouse's property and setting the resulting fire.[57]

## IV.     Negligence

25.     By way of its explicit Rule 9(h) designation, Jubilee's negligence claim lies in maritime law. To establish maritime negligence, Jubilee must demonstrate that there was a duty owed by Lighthouse to Jubilee, breach of that duty, injury sustained by Jubilee, and a causal connection between Lighthouse's conduct and Jubilee's injury.[58]

26.     The Rodi Plaintiffs seek to bring their negligence claim under Texas law. To establish a negligence cause of action under Texas law, the Rodi Plaintiffs must prove that there was a duty owed by Lighthouse to the Rodi Plaintiffs, breach of that duty, and that the breach proximately caused the Rodi Plaintiffs' damages.[59]

27.     The analysis for Plaintiffs' negligence claims is analogous under both general maritime and Texas law, and relates to whether a duty was owed, a duty was breached, and whether such breach caused the loss. Whether a defendant owed a plaintiff a legal duty is a question of law.[60] A duty is owed only with respect to an interest that is foreseeably jeopardized by an act or omission.[61] A harm is not foreseeable unless it "might have been anticipated by a reasonably

---

[57] *Id.*

[58] *Rose Crewboat Servs., Inc. v. Wood Resources, LLC*, 425 F. Supp. 3d 668, 675-76 (E.D. La. 2019) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

[59] *HIS Cedars Treatment Ctr. Of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

[60] *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. 1993)).

[61] *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010).

probable result of the act or omission[.]"[62] Under Texas law, the causation element of negligence requires a showing of proximate cause, consisting of foreseeability and cause in fact.[63] The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred.[64] "Cause in fact is not showing if the defendant's negligence did no more than furnish a condition which made the injury possible."[65] These components of proximate cause "cannot be established by mere conjecture, guess, or speculation."[66] Under the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries," which is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[67]

28.     Plaintiffs have not presented sufficient evidence establishing that Lighthouse had a duty, whether explicit or inferred, to safeguard their property from intentional criminal conduct committed by third parties, including arsonists. Lighthouse had a duty to act in the same manner as a reasonable shipyard in the Port Boliver, Texas area. Plaintiffs did not present evidence that certain similarly situated shipyards on the Southeast Texas coast have security or fire prevention standards that differ from those provided by Lighthouse.

29.     Instead, Plaintiffs cite to guidelines used by the Occupational Safety and Health Administration to protect employees as well as administrative requirements within the Maritime Transportation Security Act as examples of standards of care applicable to Lighthouse in this property damage suit.

30.     OSHA regulations are not relevant or binding in this case because Lighthouse is not Plaintiffs' employer nor does this case involve any personal injuries. The purpose of OSHA is

---

[62] *Id.* at 211-212.
[63] *Doe v. Boys Clubs*, 907 S.W.2d 472, 477 (Tex. 1995).
[64] *Id.*; *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App.—Houston [1st Dist. 1999, pet. denied).
[65] *Doe*, 907 S.W.2d at 477.  (citations omitted).
[66] *Id.*
[67] *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (citations omitted).

to obtain safe and healthful working conditions through promulgation of occupational safety and health standards which tell *employers* what they must do to avoid hazardous conditions.[68] The OSHA Preamble, OSHA regulations, and corresponding statutory grant of power by Congress make clear the regulations are designed to protect *worker safety* in the *employee/employer context*.[69] OSHA regulations are not relevant where those regulations are used to establish a standard of care in claims which do not involve the claimants' employer.[70] Specifically, where a plaintiff's vessel is destroyed by fire while being repaired at a defendant's shipyard, OSHA regulations are irrelevant because such a claim involves only property damage, not personal injury claims, and does not involve the plaintiff's employer.[71] The Court finds that citations to OSHA are not relevant in this property damage dispute.

31.     Plaintiffs next rely on the Marime Transportation Safety Act of 2002 ("MTSA") as a basis for arguing defendants breached a standard of care. Congress enacted the MTSA to address maritime transportation security and to deter potential "transportation security incidents" following September 11, 2001.[72] The MTSA provides a top-down plan for federal agencies to determine whether a "facility" or vessel faces a risk of incurring a "transportation security incident", and how to mitigate that risk. Congress defined a "transportation security incident" as "a security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area."[73] Plaintiffs have not cited to any authority that suggests Congress, or any court, intended the MTSA to apply as a standard of care to be relied upon in property damage lawsuits between a shipyard and its customer.

---

[68] *Diamond Roofing Co., Inc. v. Occupational Safety and Health Review Com'n,* 528 F.2d 645, 650 (5th Cir. 1976).

[69] 29 U.S.C. § 651.

[70] *See Ryan Marine Services, Inc. v. Hudson Drydocks, Inc.*, No. 06-2245, 2011 WL 13279155, at *2 (W. D. La. Nov. 22, 2011); *Rabon v. Automatic Fasteners, Inc.*, 672 F.2d 1231, n.12 (5th Cir. 1982).

[71] *See, e.g., Ryan Marine*, 2011 WL 13279155, at *2 (distinguishable from the facts present in this case because the shipyard in *Ryan* assisted with vessel repairs, unlike Lighthouse, who only provided space for Plaintiffs' vessels).

[72] 46 U.S.C. § 70101, et seq.

[73] *Id.* at § 70101(6).

32.     Moreover, Plaintiffs were not able to produce evidence that the Coast Guard, Department of Homeland Security, or any other governing authority has identified Lighthouse's yard as posing a risk for the occurrence of a "transportation security incident" that would make Lighthouse subject to the requirements of the MTSA.[74] Plaintiffs' citation to the MTSA as a standard with which to hold Lighthouse accountable remains unpersuasive without some evidence that Lighthouse is subject to the MTSA's guidelines.

33.     Regardless of whether the MTSA and/or OSHA provide a relevant standard of care, Plaintiffs have not produced evidence that the alleged violations of OSHA and/or the MTSA were the proximate cause of the fire or that such alleged noncompliance was unreasonable. Plaintiffs have not met their burden to connect Lighthouse's alleged non-compliance with statutory guidelines to the arson event that caused the loss of Plaintiffs' vessels. Additionally, with regard to the alleged violations of OSHA and/or MTSA regulations, Plaintiffs have not shown that Lighthouse's alleged non-compliance with these statutes was outside the ordinary care owed by a shipyard in this region to vessel owners leasing workspace.

34.     Plaintiffs had their representatives and contractors at Lighthouse every day, several weeks for Jubilee and several months for Rodi, and knew what preventative security and fire control measures were used by Lighthouse. Plaintiffs never complained, never requested additional security or fire control, and never felt that their property was unsafe at Lighthouse prior to the fire. These feelings were reinforced by good reasoning – Lighthouse had never had any prior issues with crime at its facility and has not had any issues with crime since this incident. At the time of the incident, Lighthouse had security cameras in place near the subject vessels and had a locked gate and some fencing around areas of the facility not protected by the canal. The Court finds that Lighthouse's security measures were reasonable for shipyards of this type and size in or near the

---

[74] *See* 46 U.S.C. §§ 70102, 70103.

Port Boliver area. Additionally, Lighthouse had three fire hose stations near the subject vessels in its yard and the nearest fire department was less than five minutes from the shipyard. Fire control at Lighthouse was reasonable for a yard of its size in the Port Boliver area.

35.     The Court finds that Lighthouse was not negligent and that the loss was solely caused by the acts of unknown criminals.

36.     For all the reasons stated herein, the Court finds that Lighthouse is not liable to Plaintiffs for the actions of a criminal arsonist and that Plaintiffs should not recover damages against Lighthouse as a result of those criminal actions.

## V.     Damages [if necessary].

37.     Texas law and maritime law diverge on recoverable damages for total loss in a suit involving property damage.

### A.     Maritime law

38.     "A vessel is a total (or constructive) loss when repair is not physically or economically feasible, such as when the cost of repairs exceeds the vessel's pre-casualty value."[75] If the vessel is a total loss, the measure of damages is its fair market value at the time of its loss.[76]

39.     Fair market value is "the sum which, considering all the circumstances … probably could have been obtained for [the ship] … from fair negotiations between an owner willing to sell and a purchaser desiring to buy."[77] "In determining a ship's fair-market value, courts must look first to contemporary sales of similar vessels."[78] Evidence of value other than contemporary sales can be used "only where no market value can be established."[79] When fair market value cannot be

---

[75] *Moench v. Marquette Transp. Co. Gulf-Inland, L.L.C.*, 838 F.3d 586, 592 (5th Cir. 2016) (citing *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 491 (5th Cir. 1986)).

[76] *Standard Oil Co. of New Jersey v. Southern Pacific Co.*, 268 U.S. 146, 1925 AMC 779 (1924); *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 1987 AMC 1611 (5th Cir. 1986).

[77] *Standard Oil Co.*, 286 U.S. 146, 155-56.

[78] *Archer Daniels Midland Co. v. M/T AMERICAN LIBERTY*, No. CV 19-10525, 2020 WL 10486373, at *3 (E.D. La. Aug. 5, 2020) (citing *Standard Oil Co.*, 268 U.S. at 155, 45 S. Ct. 465).

[79] *Oliver J. Olson & Co. v. Marine Leopard*, 356 F.2d 728, 1966 AMC 1064 (9th Cir. 1966).

established through contemporary sales, courts may consider "other evidence" to conduct a "more speculative analysis," including consideration of "other evidence … touching value such as the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the vessel was in, the uses to which [it] can be put, the amount of insurance that the underwriters have issued, and the like."[80] The burden is on the owner to establish the value of the vessel.[81]

40.     Under general maritime law, it is well established that there can be no recovery for loss of use when the vessel is a total loss.[82]

41.     "[W]hen determining who shall be liable for what in the wake of some loss, the court employs the rule of avoidable consequences to determine what damages are recoverable, and looks to the comparative fault scheme of *Reliable Transfer* to determine the portion of the recoverable damages each party must pay."[83] Under the doctrine of avoidable consequences, "a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them."[84] "The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages."[85] "The tortfeasor must demonstrate (1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm."[86]

42.     General maritime law does not compensate the loss of use of a private pleasure boat.[87]

---

[80] *Id.* (quoting *Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950).
[81] *Oliver J. Olson & Co. v. Marine Leopard*, 356 F.2d 728, 1966 AMC 1064 (9th Cir. 1966).
[82] *The Umbria*, 166 U.S. 404 (1897); *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir. 1989).
[83] *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1475 (5th Cir. 1991).
[84] *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947, 952 (5th Cir. 1956).
[85] *Id.* (citing *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 933 (5th Cir. 2979)).
[86] *Id.*
[87] *The Conqueror*, 166 U.S. 110 (1897); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*, 902 F.Supp.2d 808, 826 (E.D. La. 2012).

B.     **Texas law**

43.     Texas allows an owner of property that suffers a total loss to recover the fair market value of that property.[88]

44.     Texas also allows property owners to recover reasonable loss of use damages in the event of a total loss of property.[89] Under Texas law, loss of use damages are available where a claimant proves it sustained a total loss resulting from a tort-based cause of action.[90] To be entitled to loss of use damages, a claimant must first prove that the defendant is liable for the total loss.[91] Once liability is proven, the claimant may recover fair market value of the property in addition to loss of use damages, *within reasonable limits*.[92]  The Texas Supreme Court explained:

> Permitting loss-of-use damages in total-destruction cases, however, is not a license for unrestrained raids on defendants' coffers. As with all consequential damages, the availability of loss-of-use damages is necessarily circumscribed by commonsense rules. To begin with, the damages claimed may not be "too remote." This is not to say they must be "the usual result of the wrong," but they must be foreseeable and directly traceable to the tortious act. The damages also must not be speculative. Although mathematical exactness is not required, the evidence offered must rise above the level of pure conjecture. Moreover, the damages may not be awarded for an unreasonably long period of lost use. Whether framed as a duty of mitigation or a doctrine of avoidable consequences, the principle is the same: A plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property. That principle compels a plaintiff's diligence in remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the expense of the defendant. After all, the role of actual damages is to place the plaintiff in his rightful position, not the position he wishes to acquire.[93]

45.     The unknown arsonists (collectively "John Doe") have been properly designated as responsible third parties pursuant to Texas Civil Practice and Remedies Code Chapter 33.[94] A

---

[88] *J & D Towing, LLC v. Am. Alternative Ins. Corp.*, 478 S.W.3d 649, 677 (Tex. 2016).
[89] *Id*.
[90] *See, e.g., id.*
[91] *Id.*
[92] *Id.* at 676-77.
[93] *Id.* (citing Dobbs, Law of Remedies (2d) § 5.15(1), at 875) (emphasis in original).
[94] Dkt. 48; Tᴇx. Cɪᴠ. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 33.004 ("An unknown person designated as a responsible third party under Subsection (j) is denominated as 'Jane Doe' or 'John Doe' until the person's identity is known.").

responsible third party is a non-party alleged to have caused or contributed to causing the harm for which recovery of damages is sought, whether by negligent act or omission or by other conduct or activity that violates an applicable legal standard.[95] The designation of a person or entity as a responsible third party under Section 33.004 allows the fact finder to allocate liability to that person or entity in the verdict for harm caused, thereby decreasing any judgment against a defendant.[96]

46.     The total loss of the vessels occurred as a direct result of the criminal activities of an unknown third-party. Specifically, John Doe committed arson, a criminal activity, after trespassing onto the Lighthouse property after the yard was closed on the night of October 22, 2022. John Doe's criminal act is the exact type of activity that allows a person or entity to be designated as responsible third party for having "caused or contributed to causing in any way the harm for which recovery of damages is sought[.]"[97] Plaintiffs are seeking damages for loss of their vessels resulting from the fire. The designated responsible third party responsible for the fire— John Doe—should bear fault for any injury, property loss, and/or other damages resulting from the fire, in an amount commiserate with the proportion of their responsibility. Therefore, any amount awarded to Rodi for its state law negligence claim shall be reduced by a percentage equal to John Doe's percentage of responsibility, as determined by the Court as trier of fact.[98]

---

[95] TEX. CIV. PRAC. & REM. CODE § 33.011(6) ("'Responsible third party' means any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.").
[96] TEX. CIV. PRAC. & REM. CODE § 33.003.
[97] TEX. CIV. PRAC. & REM. CODE § 33.011(6).
[98] TEX. CIV. PRAC. & REM. CODE § 33.012(a).

47.     Alternatively, damages for Rodi should be limited to fair market value of the MS MONICA,[99]; if justified, loss of use for a reasonably limited period,[100]; and pre-judgment interest.[101] Rodi does not have a viable claim for recovery of attorney's fees or costs.[102]

48.     Alternatively, damages for Jubilee should be limited to fair market value of the NINO[103] and pre-judgment interest.[104] Having brought all claims pursuant to general maritime law, Jubilee is not entitled to recovery for loss of use[105] or attorney's fees.[106] Because the parties put forth evidence at trial concerning the NINO's fair market value, the Court need not engage in a "more speculative analysis" or rely on extraneous evidence, such as replacement costs.[107]

---

[99] *See Standard Oil Co. of New Jersey v. Southern Pacific Co.*, 268 U.S. 146, 1925 AMC 779 (1924); *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.*, 792 F.2d 489, 1987 AMC 1611 (5th Cir. 1986).

[100] *J & D Towing, LLC v. Am. Alternative Ins. Corp.*, 478 S.W.3d 649, 677 (Tex. 2016).

[101] *Id.* at 676; *see also Complaint of M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977).

[102] *See, e.g., Nathaniel Shipping, Inc. v. General Elect. Co.*, 920 F.2d 1256 (5th Cir. 1991); *Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1011 (5th Cir. 1984) ("The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party."); *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996) (holding that under Texas law, attorney's fees for torts must be provided by statute or contract).

[103] *See id.*; *see also Ryan Walsh Stevedoring*, 792 F.2d at 491.

[104] *Complaint of M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977).

[105] *The Umbria*, 166 U.S. 404 (1897); *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642 (5th Cir. 1989).

[106] *Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1011 (5th Cir. 1984) ("The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party.").

[107] *Oliver J. Olson & Co. v. Marine Leopard*, 356 F.2d 728, 1966 AMC 1064 (9th Cir. 1966).

Respectfully submitted,

**WILSON ELSER MOSKOWITZ**
**EDELMAN & DICKER LLP**

*/s/ Ronald L. White*
Ronald L. White
Texas Bar No. 21328300
Fed. Bar No. 234
Ronald.White@wilsonelser.com
John Bridger
Texas Bar No. 02975860
John.Bridger@wilsonelser.com
909 Fannin Street, Suite 3300
Houston, Texas 77010
Tel: 713-353-2000
Fax: 713-786-7780

**ATTORNEYS FOR DEFENDANTS,**
**LIGHTHOUSE MARINE, LLC. and**
**PENINSULA MARINE, INC.**

**OF COUNSEL:**

**GILMAN & ALLISON, LLP**
Brenton J. Allison
Texas Bar No. 24040417
Fed. Bar No. 36863
2005 Cullen Blvd.
Pearland, Texas 77581
Tel.: 713-224-6622
Fax: 866-543-3643
ballison@gilmanallison.com
**CO-COUNSEL FOR DEFENDANTS,**
**LIGHTHOUSE MARINE, LLC, and**
**PENINSULA MARINE, INC.**

**PHELPS DUNBAR LLP**
Ivan M. Rodriguez
Texas Bar No. 24058977
Fed. Bar No. 4566982
Michael A. Orlando, Jr.
Texas Bar No. 24070367
Fed. Bar No. 1051267
Brandon A. O'Quinn
Texas Bar No. 24092914

Fed. Bar No. 3099397
910 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel.: 713-626-1386
Fax: 713-626-1388
ivan.rodriguez@phelps.com
michael.orlando@phelps.com
brandon.oquinn@phelps.com
**CO-COUNSEL FOR DEFENDANTS,**
**LIGHTHOUSE MARINE, LLC, and**
**PENINSULA MARINE, INC.**


## CERTIFICATE OF SERVICE

I hereby certify that a trued and correct copy of the foregoing pleading has been served on all counsel of record, in accordance with the Federal Rules of Civil Procedure, via electronic service on this 9th day of August, 2024.

Harry E. Morse
Martin S. Bohman
Bohman | Morse, LLC.
400 Poydras Street, Suite 2050
New Orleans, LA  70130
*Attorneys for Plaintiffs*

Kevin P. Walters
Blake E. Bachtel
Royston, Rayzor, Vickery & Williams, LLP
1415 Louisiana, Suite 4200
Houston, TX 77002
*Attorney for Intervenor*
*Plaintiff Jubilee Sailing, LLC*


_/s/ **Ronald L. White**_____
Ronald L. White