**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **RODI MARINE, LLC and** | § | **CIVIL ACTION NO. 3:22-cv-00403** |
| **BOAT SERVICES OF** | § | |
| **GALVESTON, INC.** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **LIGHTHOUSE MARINE, LLC and** | § | |
| **PENINSULA MARINE, INC.** | § | **MAGISTRATE JUDGE** |
| *Defendants.* | § | **HON. ANDREW M. EDISON** |

**DEFENDANT LIGHTHOUSE MARINE, LLC'S**
**RULE 52(c) MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

Defendant Lighthouse Marine, LLC ("Lighthouse" or "Defendant") submits the following Motion for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c), and respectfully shows the following:

**<u>Introduction</u>**

1.      The presentation of evidence in this trial concluded on August 26, 2024. Plaintiffs Rodi Marine, LLC ("Rodi") and Boat Services of Galveston, Inc. ("BSOG") (collectively, the "Rodi Plaintiffs") rested their case after calling only two fact witnesses and two expert witnesses. Intervenor-Plaintiff Jubilee Sailing, LLC ("Jubilee") rested after calling two fact witnesses. All exhibits have been entered into evidence.

2.      This Motion is made against the Rodi Plaintiffs and Jubilee (collectively, "Plaintiffs") regarding all theories of liability pled against Lighthouse.[1] After the presentation of all evidence at trial, Plaintiffs have failed to meet their burden to prove by a preponderance of the evidence that Lighthouse was liable to Plaintiffs under breach of the implied warranty of workmanlike performance, breach of bailment, or negligence causes of action.

---

[1] The Rodi Plaintiffs dismissed former Defendant Peninsula Marine, Inc. on August 12, 2024.

3.    During trial, Plaintiffs did not elicit any persuasive testimony establishing how the total loss of their vessels was proximately or directly caused by actions or inactions of Lighthouse. While it is undisputed that an arson event took place, Plaintiffs failed to allege, let alone establish, how Lighthouse's actions or inactions caused or resulted in the fire. Specifically, there was no evidence presented showing what, if any, applicable shipyard safety regulations or general duties were owed or breached by Lighthouse, nor did Plaintiffs tie the cause of the fire to any of the limited services Lighthouse was contractually obligated to provide.

4.    The sole liability expert relied upon by Plaintiffs was unqualified to render any credible opinion on shipyard safety or fire response relating to shipyards similar to Lighthouse in Texas. Indeed, Plaintiff's liability expert had never read the OSHA or MTSA-related statutes that are quoted in his report, did not actually author his report, and, most importantly, by his own admission, **the arson event was just as unforeseeable to Lighthouse as it would have been to Plaintiffs**.

5.    Because all parties have rested and all evidence is before the Court, and because Plaintiffs failed to meet their burden to establish liability by a preponderance of the evidence, each of Plaintiffs' claims should be dismissed and judgment entered in Lighthouse's favor.

## Relevant Factual History

6.    The factual history of this case has been thoroughly briefed and presented to the Court.[2] In sum, this case arises from an arson event that occurred on October 22, 2022, at a typical, small Texas Gulf Coast shipyard in Port Bolivar, Texas, owned and operated by Lighthouse. The shipyard provides onshore and afloat repair and docking services to mid-sized watercraft.

---

[2] For a full recitation of the underlying facts, Lighthouse directs the Court to Defendants Lighthouse Marine, LLC and Peninsula Marine, Inc.'s Proposed Findings of Facts and Conclusions of Law [Dkt. 71], which are incorporated by reference as if fully set forth herein.

7.      On or around August 22, 2022, Plaintiff Rodi Marine LLC brought the 134-ft MS MONICA crew boat to Lighthouse's yard for repairs following an allision incident where the MS MONICA became grounded on the jetties near Galveston, Texas, and sustained considerable damage to its hull. Based on a services price sheet provided by Lighthouse to Rodi, Lighthouse agreed to haul the MS MONICA out of the water, block it on land at Lighthouse's yard, and provide shore power to the vessel. Lighthouse and Rodi understood that a third-party contractor retained by Rodi, and not affiliated with Lighthouse would perform repairs on the MS MONICA.

8.      On or around October 11 or 12, 2022, Intervenor Jubilee Sailing, LLC brought its 97-ft wooden hull sailboat NINO to Lighthouse's yard for repair and refurbishment. Based on a services price sheet provided by Lighthouse to Jubilee, Lighthouse agreed to haul the NINO out of the water, block it on land at Lighthouse's yard, and provide shore power to the vessel. Lighthouse and Jubilee understood that third-party contractors retained by Jubilee and not affiliated with Lighthouse would perform services on the NINO.

9.      The MS MONICA and NINO were blocked next to each other, around 30-35 feet apart, at the south-southeast corner of Lighthouse's yard. Contractors retained by Rodi and Jubilee performed work on their respective vessels every day that the yard was open.

10.     On the evening of October 22, 2022, around 8:30pm, several unidentified individuals entered Lighthouse's yard and set fire to the NINO. The closest fire department was dispatched at 8:48pm and arrived at 8:52pm, but the fire took several hours to extinguish. Prevailing winds at this time spread the fire to the MS MONICA.

11.     The Galveston County Sheriff's Office concluded that the fire was an arson event. There is no evidence that suggests Lighthouse itself was the target of the arson event. Lighthouse's office building, storage facilities, tools, equipment (including Lighthouse's key piece of equipment, the marine travel lift), electrical, water, and other systems were left unaffected, as were

3

other third-party vessels positioned in other areas of the shipyard on the night of the fire. No other vessels were affected by the fire, and no third party-owned property was stolen or otherwise affected. It is not known where or how the arsonists entered Lighthouse's yard.

12.     Prior to this event, Lighthouse's shipyard had never experienced arson, vandalism, pilferage, theft, or any other similar criminal activities. No evidence was presented of criminal activity, arson or otherwise, affecting businesses and/or residences located in the Port Bolivar area surrounding the Lighthouse shipyard prior to the arson event.

13.     Following the fire, the NINO and MS MONICA were declared total losses.

14.     Lighthouse was not cited for any wrongdoing or violations by any fire department, sheriff's department, arson investigator, the United States Coast Guard, or Department of Homeland Security.

## Relevant Procedural History

15.     On November 22, 2022, the Rodi Plaintiffs filed their Original Complaint for Damages against Lighthouse, seemingly[3] asserting claims for negligence, potentially a claim for breach of bailment, and breach of an implied warranty of workmanship.[4] All of the Rodi Plaintiffs' causes of action were brought pursuant to general maritime law within the meaning of Federal Rule of Civil Procedure 9(h).[5]

16.     On April 17, 2023, Jubilee filed a Complaint in Intervention against Lighthouse, asserting similar claims for breach of implied warranty of workmanlike performance, negligence, and breach of bailment.[6] Jubilee's causes of action were also brought pursuant to general maritime law under Federal Rule of Civil Procedure 9(h) and did not include any state law claims.[7]

---

[3] The Rodi Plaintiffs' Complaint for Damages [Dkt. 1] is not clear on what specific causes of action were brought against Lighthouse.
[4] Dkt. 1.
[5] *Id.*
[6] Dkt. 15.
[7] *Id.*

17.     The Rodi Plaintiffs filed their First Superseding and Amended Complaint for Compensatory and Punitive Damages on November 30, 2023 (the "Amended Complaint").[8] The Amended Complaint dropped the explicit Rule 9(h) designation and the Rodi Plaintiffs later claimed—for the first time—that the latest fault allegations were premised on both Texas law and general maritime law.[9]

18.     On February 21, 2024, Lighthouse filed its Motion for Partial Summary Judgment, seeking dismissal of Plaintiffs' claims that Lighthouse breached an implied warranty of workmanlike performance.[10] Plaintiffs filed a joint opposition and cross-motion for summary judgment on March 13, 2024, alleging, for the first time, that Lighthouse breached certain duties owed to Plaintiffs pursuant to the Occupational Safety and Health Act ("OSHA") and the Maritime Transportation Security Act of 2002 (the "MTSA").[11] Notably, the only "evidence" attached to Plaintiff's cross-motion for summary judgment were copies of the irrelevant and inapplicable OSHA and MTSA standards.[12] Lighthouse filed its Response in Opposition to Plaintiffs and Intervenor-Plaintiff's Joint Cross Motion for Partial Summary Judgment on April 3, 3024.[13]

19.     On July 23, 2024, the Court entered its Opinion and Order denying all pending motions for summary judgment,[14] which was then amended on July 24, 2024.[15] In denying the competing motions for summary judgment on Plaintiffs' breach of the implied warranty claim, the Court stated that the scope of the implied warranty "depends on the obligations that Lighthouse agreed to undertake for Plaintiffs" and that the Court would "rather decide this issue after the

---

[8] Dkt. 22.
[9] *Id.*
[10] Dkt. 44, which is incorporated by reference as if fully set forth herein.
[11] Dkt. 45.
[12] *Id.*
[13] Dkt. 47, which is incorporated by reference as if fully set forth herein.
[14] Dkt. 59.
[15] Dkt. 64.

parties fully present their positions at trial."[16] Similarly, the Court denied summary judgment on Plaintiffs' bailment claim because "there is a genuine dispute of material fact as to whether Plaintiffs delivered the vessels into Lighthouse's possession, and whether Lighthouse accepted the same[.]"[17]

20.    Trial commenced on August 12, 2024, with only Lighthouse opting to make any opening argument or presentation. Following Lighthouse's opening statement, Rodi presented its case in chief, calling two fact witnesses: Jody Jarrell, Rodi's CFO and co-owner, and Wade Guillory, Rodi's COO and co-owner. Rodi further called two expert witnesses in its case in chief: Andrew Minster, a marine surveyor for Rivers & Gulf Marine Surveyors, and John Barthelemy, a former project manager at various large shipyards in Louisiana. Mr. Minster provided testimony related to his opinions on the value of the MS MONICA. Mr. Barthelemy was designated by all Plaintiffs as the sole liability expert for shipyard safety and/or operations. In lieu of calling him live, Rodi entered the deposition transcript of Arthur Guidry, Lighthouse's yard supervisor, into evidence. Rodi then rested its case.

21.    Trial continued August 13, 2024, at which time Jubilee presented its case in chief. Jubilee called two fact witnesses: Marlene Reynaud, the project manager overseeing the refurbishment of the NINO, and the prior owner of the NINO, Ken Matheson. At the conclusion of the second day of trial, Jubilee rested its case, subject to calling a single expert witness related to valuation of the NINO when trial was scheduled to recommence on August 26, 2024.

22.    When trial continued August 26, 2024, Jubilee rested its case, opting to not call their valuation witness. Before presenting its case in chief, Lighthouse moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c); the Court initially denied the

---

[16] *Id.* at p. 4.
[17] *Id.* at p. 5.

motion after opting to hear Lighthouse's trial testimony. Lighthouse then presented its case in chief, calling two witnesses to testify as to the pre-fire value of the vessels: Joe Lombardi and Harry Stark. Lighthouse then rested its case. No other witnesses on either liability or damages are to be presented because all parties have rested, concluding the evidentiary portion of trial.

23.     Immediately after resting, Lighthouse re-urged its Rule 52(c) Motion, which the Court has now taken under advisement. At the Court's instruction, Lighthouse files this Motion to memorialize Lighthouse's Rule 52(c) arguments.

## **Legal Standard**

24.     Pursuant to Federal Rule of Civil Procedure 52(c), during a nonjury trial, the court may enter judgment after a party has been "fully heard" on an issue.[18] A judgment on partial findings entered under Rule 52(c) is to be made after the district court has heard all evidence bearing on crucial issues of fact.[19] Specifically, the Rule states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of evidence.[20]

An issue may be "fully heard" at any time during the bench trial, including after a party presents its case in chief.[21] A court entering judgment under this rule must satisfy the requirements of Rule 52(a) and find facts specially and state its conclusions of law separately.[22]

25.     "Rule 52(c) exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness."[23] Rather, a district court should provide a clear explanation of

---

[18] FED. R. CIV. P. 52(c).
[19] *Samson v. Apollo Resources, Inc.*, 242 F.3d 629, 632 (5th Cir. 2001).
[20] *Id.*
[21] *See Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 963-64 (5th Cir. 2016) ("In a bench trial, a judgment entered after the plaintiff's case in chief is appropriately decided under Federal Rule of Civil Procedure 52(c), which provides for a judgment on partial findings.").
[22] FED. R. CIV. P. 52(c).
[23] *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (internal quotations and citations omitted).

the analytical processes by which ultimate findings were reached.[24] **"The Court is not required to draw any inferences in favor of the non-moving party, as would be required for a motion for judgment as a matter of law under Rule 50, but can make findings in accordance with its own view of the evidence."**[25]

26.    Dismissal of a plaintiff's case is warranted "when the district court, even before hearing the defendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding the necessary elements of his case."[26] The Court may therefore grant judgment on partial findings at the close of a plaintiff's case even if a *prima facie* case has been presented.[27]

<u>**Argument**</u>

27.    Plaintiffs have fully presented all testimony and evidence to the Court related to Lighthouse's potential liability under breach of the implied warranty of workmanlike performance, bailment, and negligence. Plaintiffs have not satisfied their burden to prove Lighthouse's liability relating to any of these causes of action by a preponderance of the evidence. Throughout trial, Plaintiffs failed to put forward any evidence or a coherent argument regarding *why Lighthouse was negligent*, instead leaving it to the Court to sift through the exhibit list to find liability where none could be verbally elicited.

**I.    The Court should dismiss Plaintiffs' breach of the implied warranty of workmanlike performance claims because Plaintiffs did not present any evidence that the contractual services resulted in the damage to the vessels.**

28.    Plaintiffs allege that Lighthouse breached the warranty of workmanlike performance present in all maritime contracts. "Unless excluded by agreement, all maritime

---

[24] *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1053-54 (5th Cir. 1997).

[25] *Miles-Hickman v. David Powers Homes, Inc.*, 613 F. Supp. 2d 872, 880 (S.D. Tex. 2009); *see also Weber v. Gainey's Concrete Prod., Inc.*, 1998 WL 699047, at *1 n.1 (5th Cir. Sept. 21, 1998) (unpub.) ("[W]hen dismissing a case pursuant to Rule 52(c), a court is not required to make any special inferences or review the facts in the light most favorable to the plaintiff.").

[26] *DuPont v. Southern Nat'l Bank*, 771 F.2d 874, 879 (5th Cir. 1985).

[27] *Culpepper v. LA-I Gaming*, 203 F.3d 827, 1999 WL 1235712, at *1 (5th Cir. 1999) (not selected for publication in the Federal Reporter).

service contracts include an implied warranty of workmanlike performance."[28] The warranty of workmanlike performance binds the ship repairer to use that degree of diligence, attention, and skill which is adequate to complete the task.[29] "To recover from a contractor for breach of an implied warranty of workmanlike performance, a shipowner must prove that the contractor breached the warranty, and that the breach proximately caused the injury."[30] "The implied warranty of workmanlike performance is breached where a contractor fails to perform his obligation properly and safely."[31] Where a contractor "properly performs the 'essence' or 'inescapable elements' of a contract, no cause of action for breach [of the implied warranty of workmanlike performance] will lie."[32]

29.    "In practice, the standard need not differ from the test for ordinary maritime negligence."[33] "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury."[34] "The requirements of causation and foreseeability still apply to claims under the WWLP."[35] Thus, Plaintiffs' burden at trial is to show negligence and causation by a preponderance of the evidence.[36] Plaintiffs must put the Court in a position to determine whether it is more probable than not that the alleged faulty repairs caused the alleged damages.[37] Plaintiffs have failed to satisfy this burden

---

[28] *Cont'l Ins. Co. v. Bollinger Quick Repair, LLC*, No. 18-2810, 2021 WL 1313406, at *2 (E.D. La. 2021) (Barbier, J.) (citing *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 416 (5th Cir. 1982).

[29] 1 Admiralty & Mar. Law, Thomas J. Schoenbaum, § 5:14 (6th ed.).

[30] *Butterfly Transp. Corp. v. Bertucci Indus. Servs., LLC*, 351 F. App'x 855, 858 (5th Cir. 2009) (citing *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 302 (5th Cir. 1973)).

[31] *Penn Maritime, Inc. v. Rhodes Electronic Servs., Inc.*, 41 F. Supp. 3d 507, 516 (E.D. La. 2014) (citing *Butterfly Transp. Corp.*, 351 F. App'x at 858).

[32] *Id.*

[33] *Penn Maritime, Inc. v. Rhodes Electronic Servs., Inc.*, 41 F. Supp. 3d 507, 516 (E.D. La. 2014).

[34] *Rose Crewboat Servs., Inc. v. Wood Resources, LLC*, 425 F. Supp. 3d 668, 675-76 (E.D. La. 2019) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

[35] *Penn Maritime, Inc.*, 41 F. Supp. at 516.

[36] *See Marquette Transportation Co. v. Louisiana Machinery Co.*, 367 F.3d 398, 402 (5th Cir. 2004).

[37] *See, e.g., id.*

because Plaintiffs did not obtain any testimony at trial or through exhibits establishing a causal connection between the services provided by Lighthouse and the total loss of the vessels.

30.    All evidence at trial exhibited that Lighthouse performed all work related to Plaintiffs' vessels with reasonable care. There was no testimony that those services caused or contributed to MS MONICA's total loss as a result of the fire. As identified in the August 22, 2022, quote prepared by Lighthouse to Rodi, the scope of services offered by Lighthouse was limited to hauling out the vessel, blocking the vessel, providing shore power to the vessel, and providing space in the shipyard for the vessel.[38] In addition to the services enumerated on the quote, Rodi later requested that Lighthouse provide sandblasting and painting services for the MS MONICA. Other than these services, Lighthouse did not provide any repairs to the MS MONICA or perform any work on the MS MONICA prior to the fire. All other work performed on the vessel was conducted by third parties hired by Rodi.

31.    Both Mr. Jarrell and Mr. Guillory testified at trial that these services were the entirety of the services provided by Lighthouse to Rodi pursuant to any agreement between the parties.[39] Mr. Jarrell and Mr. Guillory further testified that such services were provided by Lighthouse to Rodi's satisfaction and without issue.[40] Specifically, when asked whether there were any other services or goods that Lighthouse was contracted by Rodi to provide other than the provision of space, Mr. Guillory answered "[n]o," then stated unambiguously that Rodi was "there for the haul out, the blocking. Then there was the finishing up for the paint."[41]

32.    Similarly, in accordance with the price sheet for services sent to Jubilee, Lighthouse agreed to haul the NINO out of the water, block it in Lighthouse's yard, provide space for the

---

[38] Exhibit 87: Lighthouse's Quote to Rodi, dated August 22, 2022.
[39] Dkt. 76, 102:1-104:4; 271:24-272:16.
[40] *Id.*
[41] Dkt. 76, 272:7-16.

NINO, and provide shore power to the NINO.[42] At trial, Ms. Reynaud confirmed that these services were the sum total[43] of Lighthouse's contractual obligations to Jubilee, and that no other contract or agreement was in place at any time prior to the fire.[44] Further, Ms. Reynaud testified that Lighthouse provided shore power, blocking, hauling out, and providing space for the NINO successfully and without complaint.[45] More to the point, when asked whether all services Lighthouse had been contracted to perform up to the point of the fire had been performed satisfactorily, Ms. Reynaud testified in the affirmative.[46]

33.    Plaintiffs did not elicit any testimony that the arson event was the result of the limited scope of services—hauling out, blocking, provision of shore power, or provision of space—provided by Lighthouse. Further, Plaintiffs' witnesses could not point to any evidence that showed Lighthouse contractually agreed to provide any specific safety provisions related to the space rented by Plaintiffs.  Mr. Jarrell generally testified that he assumed the provision of "lay days" meant "the boat would be sitting in a safe and secure location"[47] and that Rodi was "paying Lighthouse for security."[48] Mr. Jarrell could not, however, cite to any provision in the parties' agreement supporting this position, and instead based this opinion on his alleged experience with other unidentified shipyards.[49] However, these assumptions and inferences are not supported by the explicit terms of the agreements between the parties, which Plaintiffs' own fact witnesses testified were limited to those services enumerated above. The threshold issue involved in

---

[42] Exhibit 51: Lighthouse's Quote to Jubilee, dated September 28, 2022.
[43] Ms. Reynaud testified it was possible that Lighthouse provided pressure washing services; however, her testimony also indicates these services may have been provided instead the first time the NINO was at Lighthouse's shipyard. Dkt. 77, 110:7-11:2. Regardless, Ms. Reynaud testified that if such services were performed, they were performed satisfactorily and without complaint. *Id.*
[44] Dkt. 77, 109:2-111:25.
[45] *Id.*
[46] Dkt. 77, 111:22-25.
[47] Dkt. 76, 52:3-20.
[48] Dkt. 76:4-5.
[49] Dkt. 76, 168:4-169:3.

evaluating and proving a claim for breach of the implied warranty of workmanlike performance is whether the *contractual services proximately caused the damage*.[50] Therefore, the Court's analysis should be limited to those services contained within the four corners of the contract and not what Plaintiffs want to now read into or extrapolate from the contracts. Moreover, Mr. Jarrell is not qualified to provide expert opinions on the course and scope of shipyard industry standards regarding what is impliedly included in payment for "lay days," or any duties—implied or otherwise—owed by a shipyard such as Lighthouse; remember, Mr. Jarrell had never been to Lighthouse's yard and generally leaves operations to his partner, Mr. Guillory.

34.     It is Plaintiffs' burden to establish that it is more probable than not that the faulty repairs or services complained of and subject to the contract resulted in the alleged damages.[51] The evidence is abundantly clear that Lighthouse was only obligated to provide a limited scope of services to Plaintiffs, and that those services were completed without issue or complaint. It is equally clear from the testimony and evidence presented that the fire was the result of the actions of an unknown arsonist, not attributable to or caused by any of the services Lighthouse provided to Plaintiffs. Accordingly, the evidence presented at trial does not support Plaintiffs' breach of warranty claims and Lighthouse requests that the Court find that Lighthouse is not liable to Plaintiffs under any breach of contract or breach of an implied warranty claim.

35.     Plaintiffs' claims for breach of the implied warranty of workmanlike performance should therefore be dismissed.

**II.    The Court should dismiss Plaintiffs' bailment claims because there is no evidence that Lighthouse had exclusive control of the vessels or that the vessels were "delivered" to Lighthouse.**

---

[50] *See Marquette Transportation Co.*, 367 F.3d at 402.
[51] *See id.*

36.    In general, both Plaintiffs argue that Lighthouse is liable for their losses because their vessels were damaged while in Lighthouse's "possession." Plaintiffs contend this necessitates a bailment cause of action. In fact, Plaintiffs seem to place a premium on their bailment argument, contending at trial that it is the only cause of action that matters to them.

37.    Prior to trial, Rodi argued that its bailment claim arises under Texas law, but its argument for application of Texas law was unconvincing. Any bailment relationship between Plaintiffs and Lighthouse necessarily arises out of Lighthouse's contractual agreement to haul their vessels out of the water and provide storage space for the vessels. This agreement is clearly maritime in nature,[52] which should make a bailment agreement also maritime in nature. However, maritime bailment law and Texas bailment law are not so dissimilar to affect the overall claims made by Plaintiffs against Lighthouse. The issue of what law applies on bailment is not dispositive to the Court's conclusions.

38.    Under general maritime law, a contract for the storage or repair of a vessel constitutes a bailment agreement.[53] The law of bailment is applicable in suits for damages to a vessel that has been left with another for the purpose of repairs.[54] The Fifth Circuit has defined bailment as:

> A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.[55]

---

[52] *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23-24, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004); *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S.119, 128, 39 S.Ct. 221, 63 L.Ed. 510 (1919); *see also Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348-49 (11th Cir. 1994) (holding that a ship in a dry dock is "in or on navigable waters for purposes of admiralty jurisdiction.").

[53] *See Snyder v. Four Rinds Sailboat Centre, Ltd.*, 701 F.2d 251, 252 (2d Cir. 1983); *Hudson River Cruises, Inc. v. Bridgeport Drydock Corp.*, 892 F. Supp. 380, 385 (D. Conn. 1994).

[54] *Buntin v. Fletchas*, 257 F.2d 512, 513 (5th Cir. 1958).

[55] *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) (cleaned up).

The burden of proof of negligence is on the bailor, but by proving that the vessel was delivered to the bailee in good condition and damaged while in the bailee's possession, the bailor makes a *prima facie* case of negligence.[56] A bailee is liable for damage to the property resulting from its negligence.[57]

39.     Under general maritime law, bailment does not arise unless delivery to the bailee is complete and the bailee has exclusive possession of the bailed property, even as against the property owner.[58] No inference or presumption of negligence can arise against a bailee if its possession of the damaged property was not exclusive to that of the bailor.[59] Where both parties have equally unrestricted access to the vessel at all times, there is no basis for an inference of negligence.[60] When the presumption of negligence in a bailment claim is overcome, a bailment cause of action folds into a general negligence cause of action.[61]

40.     In Texas, courts consider the following elements when determining whether a bailment relationship exists: (1) the delivery of personal property from one person to another for a specific purpose; (2) acceptance by the transferee of such delivery; (3) an agreement that the purpose will be fulfilled; and (4) an understanding that property will be returned to the transferor.[62] When exclusive possession has not been delivered and control and dominion of the property is dependent in no degree upon to co-operation of the owner of the premises, a landlord and tenant relationship is created, not a bailment.[63] A bailee has the duty to exercise ordinary care over goods

---

[56] *Stegemann v. Mia. Beach Boat Slips*, 213 F.2d 561, 564 (5th Cir. 1954).

[57] *Muller Boat Works, Inc. v. Unnamed 52' House Barge*, 464 F. Supp. 2d 127, 147 (E.D.N.Y. 2006) (quoting *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991)).

[58] *Thyssen Steel Co. v. M/V Kavo Yerakas*, 50 F.3d 1349 (5th Cir. 1995).

[59] *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 19 (1st Cir. 1991) (citing *United States v. Mowbray's Floating Equipment Exchange*, 601 F.2d 645 (2d Cir. 1979).

[60] *Id.*

[61] *See Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322 (5th Cir. 1962) (stating that once a bailee overcomes the presumption of negligence in a bailment claim by coming forward with evidence sufficient to show it exercised ordinary care, "the burden of going forward would shift back to [the bailor] to ultimately persuade the trier of fact of the facts of negligence[.]").

[62] *Cessna Aircraft Co. v. Aircraft Network, LLC*, 213 S.W.3d 455, 462 (Tex. App.—Dallas 2006, pet. denied).

[63] *Sisters of Charity of the Incarnate Word v. Meaux*, 122 S.W.3d 428, 431-32 (Tex. App.—Beaumont 2003, pet.

14

delivered within its exclusive dominion and control for a specific purpose, whereas a lessor has the duty of ordinary care in maintaining the premises it controls, with no duty regarding a lessee's property stored on the premises.[64] For a bailment relationship to exist, the property owner must prove it delivered personal property to another in trust for a specific purpose that will be carried out by the bailee.[65] Where the property owner merely rents space from the premises owner and leaves personal property on that space without surrendering control and dominion of the personal property to the premises owner, a bailment relationship has not been created, and the premises owner owes only the duty of a lessor.[66]

41.     Plaintiffs have not presented any evidence that a bailment relationship was formed with Lighthouse. The evidence conclusively shows that Rodi never relinquished control of the MS MONICA to Lighthouse and that Lighthouse never took control over the vessel exclusive to the rights of others. Rather, the testimony of Rodi's witnesses establishes that Rodi maintained control over the MS MONICA while it was in Lighthouse's shipyard. Mr. Jarrell testified that he did not know whether or not Lighthouse had access to the vessel,[67] but that Rodi's representatives had access to the vessel at all times, including Captain Swafford.[68] Third-party contractors hired by Rodi had access to the vessel to perform work on the vessel.[69] Mr. Guillory testified that Captain Swafford had access to the vessel, and frequently visited the vessel, at all times while it was in the shipyard from start to finish.[70] Mr. Guillory visited the vessel in the shipyard five to six times prior to the fire.[71]

---

denied).

[64] *Id.* at 432 (citing *Marine Indem. Ins. Co. of America v. Lockwood Warehouse & Storage*, 115 F.3d 282, 286 (5th Cir. 1997).

[65] *Id.* at 431.

[66] *Id.* at 431-32; *Lockwood Warehouse*, 115 F.3d at 286.

[67] Dkt. 76, 186:3-5.

[68] Dkt. 76, 180:6-7.

[69] Dkt. 76, 180:1-3.

[70] Dkt. 76, 272:17-273:1.

[71] Dkt. 76, 220:24-221:4.

42.    Similarly, Jubilee has not established that it formed a bailment relationship with Lighthouse. Ms. Reynaud has testified that she was present at the shipyard daily to oversee and direct the third-party contractors' repairs,[72] as were the third-party contractors Jubilee hired to complete work on the NINO at the shipyard.[73] As with Rodi, Jubilee hired independent contractors to complete all work on the vessel prior to the fire.[74] The evidence further establishes that Ms. Reynaud and her contractors retained the keys to the NINO and locked up every night.[75]

43.    Following trial testimony, it appears that Plaintiffs concede that the vessel was not in their exclusive possession (or was not delivered to Lighthouse) during business hours, but now apparently contend that the vessel was not in their exclusive possession outside of normal operating hours. This, however, is not the standard for proving a bailment relationship was created. The question is not whether the bailee *sometimes* has control over the property; it is whether the bailee maintains *exclusive* control over the property, depriving the owner and/or its representatives of access from the time of delivery to the bailee through the time of delivery back to the bailor.[76] Plaintiffs have not presented any case law or expert opinion that states that a bailment relationship could exist from 5pm to 9am, but not from 9am to 5pm.

44.    Further, the unrebutted testimony of Lighthouse's yard manager, Arthur Guidry, establishes that vessel owners and/or their crews had the opportunity to stay overnight at the shipyard on their vessels.[77] Per Mr. Guidry's testimony, on the night of the fire, the captain and at least one deckhand of a third-party vessel were spending the night in the shipyard on their vessel.[78] Further, Mr. Arthur Guidry testified that should a vessel owner need access to a vessel overnight—

---

[72] Exhibit 124: Deposition Transcript of Marlene Reynaud, dated August 9, 2023, 117:19-118:7; 132:21-135:1.
[73] Dkt. 77, 109:2-9.
[74] Exhibit 124, 126:132:21-133:8.
[75] Exhibit 124, 147:8-148:24.
[76] *See Thyssen Steel Co. v. M/V Kavo Yerakas*, 50 F.3d 1349 (5th Cir. 1995).
[77] Exhibit 125: Deposition Transcript of Arthur Guidry, dated August 22, 2023, 44:15-19; 49:24-50:19; 142:1-9.
[78] Exhibit 124, 142:1-9.

even for something minor like a grocery delivery—all the vessel owner need do was contact Mr. Guidry and he would unlock the gate to permit after-hours access.[79]

45.    Plaintiffs have not presented any evidence proving that the vessels were delivered into Lighthouse's exclusive control. The evidence presented establishes that Plaintiffs retained control over their vessels, directed what work was to be completed on the vessels, hired third-party contractors to complete the work, and had access to the vessels at all times, including after-hours if needed. The record is devoid of any evidence establishing that Lighthouse maintained control of the vessels to the exclusion of others. In fact, the evidence establishes the opposite: the vessels were accessed and worked on by Plaintiffs and their representatives on a daily basis.

46.    For these reasons, Plaintiffs' claims under a bailment theory of liability should be dismissed.

## III.    The Court should dismiss Plaintiffs' negligence claims because there is no evidence that the damage was foreseeable or that Lighthouse breached any duty owed to Plaintiffs.

47.    By way of its explicit Rule 9(h) designation, Jubilee's negligence claim lies in maritime law. To establish maritime negligence, Jubilee must demonstrate that there was a duty owed by Lighthouse to Jubilee, breach of that duty, injury sustained by Jubilee, and a causal connection between Lighthouse's conduct and Jubilee's injury.[80]

48.    The Rodi Plaintiffs seek to bring their negligence claim under Texas law. To establish a negligence cause of action under Texas law, the Rodi Plaintiffs must prove that there was a duty owed by Lighthouse to the Rodi Plaintiffs, breach of that duty, and that the breach proximately caused the Rodi Plaintiffs' damages.[81]

---

[79] Exhibit 124, 51:20-25.
[80] *Rose Crewboat Servs., Inc. v. Wood Resources, LLC*, 425 F. Supp. 3d 668, 675-76 (E.D. La. 2019) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).
[81] *HIS Cedars Treatment Ctr. Of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

49.     The analysis for Plaintiffs' negligence claims is analogous under both general maritime and Texas law, and relates to whether a duty was owed, a duty was breached, and whether such breach caused the loss. Whether a defendant owed a plaintiff a legal duty is a question of law.[82] **A duty is owed only with respect to an interest that is foreseeably jeopardized by an act or omission.**[83] A harm is not foreseeable unless it "might have been anticipated by a reasonably probable result of the act or omission[.]"[84] Under Texas law, the causation element of negligence requires a showing of proximate cause, consisting of foreseeability and cause in fact.[85] The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred.[86] "Cause in fact is not showing if the defendant's negligence did no more than furnish a condition which made the injury possible."[87] These components of proximate cause "cannot be established by mere conjecture, guess, or speculation."[88] Under the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries," which is "something more than 'but for' causation, and the negligence must be a 'substantial factor' in the injury."[89]

50.     Plaintiffs have not presented any evidence establishing that shipyards similar to Lighthouse on the Texas Gulf Coast owe certain express or implied duties to vessels in their yards, that Lighthouse qualifies as owing these duties, that Lighthouse breached these duties, or that any breach of duty caused the subject arson event. On Day 3 of Trial, the Court point-blank asked Plaintiffs: "Why is Lighthouse negligent?" In response, Plaintiffs could only recite OSHA and

---

[82] *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 333 (5th Cir. 1993)).
[83] *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010).
[84] *Id.* at 211-212.
[85] *Doe v. Boys Clubs*, 907 S.W.2d 472, 477 (Tex. 1995).
[86] *Id.*; *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App.—Houston [1st Dist. 1999, pet. denied).
[87] *Doe*, 907 S.W.2d at 477 (citations omitted).
[88] *Id.*
[89] *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992) (citations omitted).

MTSA regulations and Lighthouse's alleged "violation" of those regulations. However, there is no evidence that such regulations even applied to Lighthouse's shipyard or the facts of this case, nor is there any evidence that Lighthouse breached such regulations or that the alleged breach proximately caused the arson event. Plaintiffs' own self-serving recitations of Lighthouse's alleged violation of certain federal regulations is not evidence. Lighthouse had a duty to act in the same manner as a reasonable shipyard in the Port Boliver, Texas area that had no history of criminal conduct in or around its yard. Plaintiffs presented no evidence establishing what, if any, duties are created by the standards, customs, or practices of Texas shipyards of Lighthouse's small size. Plaintiffs did not present evidence that any similarly situated shipyards on the Texas Gulf Coast have security or fire prevention standards that differ from those provided by Lighthouse. Finally, Plaintiffs did not present any evidence or testimony that the fire would have been prevented had Lighthouse complied with all Plaintiffs' cited regulations.

51.     The sole liability expert proffered by Plaintiffs, John Barthelemy, conceded that he had "never been in a shipyard in Texas,"[90] nor did he have experience with shipyards of Lighthouse's small size.[91] Mr. Barthelemy further testified that he did not have any training or skills in the areas of safety or security, fire prevention services, or arson events.[92] Mr. Barthelemy's sole exposure to safety and security of shipyards was during his tenure as project manager when he consulted his large shipyard's safety department.[93] Mr. Barthelemy conceded he did not have the requisite training or knowledge to make decisions on safety.[94] Further, Mr. Barthelemy did not have any knowledge concerning how a shipyard should be configured in order to make it safe or unsafe in response to an arson event.[95] In short, Mr. Barthelemy's testimony regarding safety

---

[90] Dkt. 76, 391:13-17.
[91] Dkt. 76, 391:18-392:3.
[92] Dkt. 76, 393:25-395:7.
[93] Dkt. 76, 395:8-16.
[94] Dkt. 76, 396:9-14.
[95] Dkt. 76, 396:24-397:4.

practices and/or duties owed by shipyards to vessel owners is not credible and should not carry any weight.

52. Over the course of pre-trial filings, Plaintiffs generally cited to OSHA and MTSA regulations as examples of standards of care allegedly applicable to Lighthouse's operation of the shipyard. Contrary to Plaintiffs' contentions, Mr. Barthelemy's testimony left no doubt that OSHA and the MTSA have absolutely no bearing on Lighthouse's duties *or* the cause of the fire:

> Q. Okay. In your report you mention a variety of OSHA regulations, Occupational Safety and Health Administration regulations for shipyards.
> A. Correct.
> Q. Did you deal with those type regulations during your various jobs as project manager or senior project manager at the shipyards you mentioned?
> A. I wasn't familiar with the numbers as with the -- the particular thing, but I did -- how can I say this? I did pull those particular things on my job, but I'm not familiar with the regulations as they're numbered, if that makes sense.
> Q. All right. So if I understand then, you had intermittent occasions to use or to refer to OSHA shipyard regulations, but it's certainly not an area of your expertise?
> A. That's correct.
> Q. Not something you dealt with on a day-to-day basis?
> A. That's correct.
> Q. And you understand that OSHA regulations are designed with regard to safety in an employer/employee relationship involving shipyard workers?
> A. Yes.
> Q. Okay. Are you aware of any injuries or death that occurred to shipyard workers as a result of the incident in the Lighthouse shipyard?
> A. I'm sorry. Would you repeat that, please?
> Q. Are you aware of any indication of any injuries or deaths occurring to shipyard workers at Lighthouse shipyard as a result of this incident?
> A. No, sir.
> Q. Okay. So how, then, does OSHA shipyard regulations fit into this equation?
> A. I was just using those -- those numbers, those regulations to show what should be done in a normal shipyard operation as far as safety.

Q. And you're talking in a general sense?
A. That's correct.
Q. Between the employer and its employees?
A. That's correct.
Q. All right. And this case doesn't have anything to do
with the issues between an employer and its employees,
does it?
A. Well, if I may, I think the purpose of my report
was -- after me visiting the shipyard was to show that out
of all the shipyards I ever been in and worked in, this
particular shipyard seemed lax in safety.
Q. In areas that had nothing to do with causing or
contributing to the event which gave rise to the
destruction of these vessels?
A. That's correct.[96]

***

Q. And at the time of the incident, the existence or
nonexistence of a certified and trained safety manager or
person to supervise yard personnel and/or work to be
accomplished had nothing to do with causing or
contributing to the fire which gave rise to the
destruction of these vessels?
A. That's correct.
Q. All right. The existence or nonexistence of a fire
safety plan had nothing to do with an arson fire that
occurred after regular business hours, did it?
A. That's correct.
Q. Whether Lighthouse was or was not aware of the OSHA
regulations for shipyards is a moot point in terms of
causing or contributing to the fire which caused the
destruction of these vessels?
A. That's correct.
Q. All right. Whether or not Lighthouse had ever run a
fire drill. Fire drills are run during normal business
hours for the benefit of the shipyard workers who work
there, correct?
A. That's correct.
Q. So there would -- whether Lighthouse ever did or did
not run a fire drill during normal business hours has
nothing to do with an arson-inspired fire which occurred
at night after the close of regular business, correct?
A. Correct.[97]

***

---

[96] Dkt. 76, 397:14-399:14.
[97] Dkt. 76, 401:23-402:23.

Q. Now, you mention in there also, apart from OSHA
regulations, NVIC, a circular from the government, which
relates to threat assessment and so forth from Homeland
Security, U.S. Department of Homeland Security. And it's
dated back in August of 2004.
Are you familiar with NVIC 11-02 which I'm referring
to?
A. I've seen it, but I'm not familiar with it.
Q. All right. Well, that was my first question.
When did you first become aware of this Navigation and
Vessel Inspection Circular as it's titled and as it's
referred to in your report?
A. I've seen it a few times at the shipyards I worked at,
but I've never really read it or understood exactly what
it meant.[98]

***

Did you verify with Homeland Security or the United
States Coast Guard or any other federal agency that
Lighthouse Marine, LLC's facility in Port Bolivar, Texas,
was on the list of facilities that was subject to these
type regulation -- these type notices?
A. No.
Q. Or that they needed to be involved in preparing and
providing the Coast Guard or Homeland Security with a risk
assessment plan directed toward preventing terrorism at
their tiny facility in Port Bolivar, Texas?
A. No, sir.[99]

53.    Incredibly, Mr. Barthelemy also testified that he did not write his own expert report
and that it was not his idea or experience that led him to include MTSA-related guidelines in his
report.[100] Almost as incredible, and after six-months of claiming otherwise, Rodi's counsel
conceded at trial that OSHA regulations are not pertinent to the case.[101]

54.    Accordingly, Plaintiffs have not presented any evidence that OSHA or MTSA
regulations are applicable to Lighthouse or that Lighthouse's alleged failure to comply with said

---

[98] Dkt. 76, 403:6-20.
[99] Dkt. 76, 405:25-406:10.
[100] Dkt. 76, 404:9-13; 405:5-9.
[101] Dkt. 76, 399:16-400:16.

regulations caused the fire. Moreover, Plaintiffs have no testimony or evidence that Lighthouse's alleged non-compliance with these statutes was outside the ordinary care owed by a shipyard in this region to vessel owners leasing workspace. Plaintiffs have therefore not produced evidence that OSHA or the MTSA have any applicability to this lawsuit, that the alleged violations of OSHA and/or the MTSA were the proximate cause of the fire, or that any alleged noncompliance was unreasonable. Based on the foregoing, Plaintiffs have clearly not met their burden to connect Lighthouse's alleged non-compliance with statutory guidelines to the arson event that caused the loss of Plaintiffs' vessels.

55.    Additionally, Plaintiffs had their representatives and contractors at Lighthouse every day, several weeks for Jubilee and several months for Rodi, and knew what preventative security and fire control measures were used by Lighthouse. In light of this knowledge and their own observations as to daily operations being conducted at Lighthouse, Plaintiffs never complained, never requested additional security or fire control, and never felt that their property was unsafe at Lighthouse prior to the fire. Ms. Reynaud testified that she never had any complaints or voiced any concerns about the security of the shipyard, and that despite being there on a daily basis, she did not ever observe any activity that caused any concern for the safety or security of the NINO.[102] These feelings were reinforced by good reasoning–Lighthouse had never had any prior issues with crime at its facility and has not had any issues with crime since this incident.[103] At the time of the incident, it is undisputed Lighthouse had security cameras in place near the subject vessels and had a locked gate and fencing around areas of the facility not protected by the canal. As to fire prevention capabilities, it is further undisputed that Lighthouse had three fire hose

---
[102] Dkt. 77, 89:24-90:23.
[103] Exhibit 125, 57:4-24; 59:8-13.

23

stations near the subject vessels in its yard and the nearest fire department was less than five minutes from the shipyard.[104]

56.    Lighthouse's expert MP Singh, stated in his report that fire control and security at Lighthouse was reasonable for a yard of its size in the Port Boliver area and that no actions or inactions of Lighthouse contributed to the arson event.[105]

57.    While the foregoing shows that Plaintiffs have failed to satisfy their burden as to Lighthouse's negligence, the most important testimony of the trial came from Plaintiffs' own retained shipyard liability expert, Mr. Barthelemy, when he testified **the arson event was equally as unforeseeable to Lighthouse as it was to Plaintiffs**.[106]

> Q. Okay. Are you aware of any evidence to suggest that there has ever been an arson-related fire at Lighthouse shipyard during its existence?
> A. No, sir.
> Q. Or a fire of any type at Lighthouse during the course of its existence?
> A. No, sir.
> Q. Daytime or nighttime?
> A. No, sir.
> Q. All right. Are you aware of any evidence to suggest that Lighthouse has been the subject or victim of theft at their facility?
> A. No, not to my knowledge.
> Q. Pilferage?
> A. No, sir.
> Q. Vandalism?
> A. No, sir.
> Q. Any criminal act?
> A. No, sir.
> **Q. Would it seem logical to you that arson then, under those circumstances at their facility, would be as unforeseeable to them as it would be to the two vessel owners that have filed this lawsuit?**
> **A. Yes, sir.**[107]

---

[104] Exhibit 125, 64:15-25; 66:5-11; 70:6-16; 72:24-73:13; 120:10-15; 127:9-11
[105] Exhibit 118 at ¶¶ 9, 10, 11.
[106] Dkt. 76, 407:5-9.
[107] Dkt. 76, 406:11-407:9.

58.     The record is devoid of any evidence that Lighthouse's security or safety measures were unreasonable for shipyards of its type and size in or near the Port Boliver area.

59.     For these reasons, Lighthouse cannot be held liable to Plaintiffs for the acts of a criminal arsonist, and Plaintiffs' negligence claim should be dismissed.

## Conclusion

60.     Plaintiffs have been fully heard on the issue of liability for each of its asserted claims. Plaintiffs' evidence does not show by a preponderance of the evidence that Lighthouse breached the implied warranty of workmanlike performance, breached any bailment obligations, or owed or breached any duties giving rise to negligence. To the contrary, the evidence shows that Lighthouse provided Plaintiffs with a limited scope of services that were provided without issue, that Plaintiffs maintained control or, at minimum, access to the vessels while at the shipyard, and that the arson event that resulted in the total loss of the MS MONICA and NINO was an unforeseeable event that did not result from the breach of any duty, explicit or otherwise.

61.     Accordingly, Lighthouse Marine, LLC respectfully requests that the Court enter judgement for Lighthouse on all Plaintiffs' causes of action, and grant any further relief, in law or in equity, to which Lighthouse may be entitled.

Respectfully submitted,

**WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP**

Respectfully submitted,

**WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP**

*/s/ Ronald L. White*
Ronald L. White
Texas Bar No. 21328300
Fed. Bar No. 234
Ronald.White@wilsonelser.com
John Bridger
Texas Bar No. 02975860
John.Bridger@wilsonelser.com
909 Fannin Street, Suite 3300
Houston, Texas 77010
Tel: 713-353-2000
Fax: 713-786-7780

**ATTORNEYS FOR DEFENDANTS,
LIGHTHOUSE MARINE, LLC. and
PENINSULA MARINE, INC.**

**OF COUNSEL:**

**GILMAN & ALLISON, LLP**
Brenton J. Allison
Texas Bar No. 24040417
Fed. Bar No. 36863
2005 Cullen Blvd.
Pearland, Texas 77581
Tel.: 713-224-6622
Fax: 866-543-3643
ballison@gilmanallison.com
**CO-COUNSEL FOR DEFENDANTS,
LIGHTHOUSE MARINE, LLC, and
PENINSULA MARINE, INC.**

26

**PHELPS DUNBAR LLP**
Ivan M. Rodriguez
Texas Bar No. 24058977
Fed. Bar No. 4566982
Michael A. Orlando, Jr.
Texas Bar No. 24070367
Fed. Bar No. 1051267
Brandon A. O'Quinn
Texas Bar No. 24092914
Fed. Bar No. 3099397
910 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel.: 713-626-1386
Fax: 713-626-1388
ivan.rodriguez@phelps.com
michael.orlando@phelps.com
brandon.oquinn@phelps.com
**CO-COUNSEL FOR DEFENDANTS,
LIGHTHOUSE MARINE, LLC, and
PENINSULA MARINE, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a trued and correct copy of the foregoing pleading has been served on all counsel of record, in accordance with the Federal Rules of Civil Procedure, via electronic service on this 28th day of August, 2024.

Harry E. Morse
Martin S. Bohman
Bohman | Morse, LLC.
400 Poydras Street, Suite 2050
New Orleans, LA  70130
*Attorneys for Plaintiffs*

Kevin P. Walters
Blake E. Bachtel
Royston, Rayzor, Vickery & Williams, LLP
1415 Louisiana, Suite 4200
Houston, TX 77002
*Attorney for Intervenor
Plaintiff Jubilee Sailing, LLC*

*/s/ Ronald L. White*
Ronald L. White

27