United States District Court
Southern District of Texas

**ENTERED**

March 27, 2026

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RODI MARINE, LLC, *et al.*, | § | |
| | § | |
| Plaintiffs. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:22-cv-00403 |
| | § | |
| LIGHTHOUSE MARINE, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Rodi Marine, LLC and Boat Services of Galveston, Inc. ("BSOG") (collectively, the "Rodi Plaintiffs") brought this action against Defendants Peninsula Marine, Inc. and Lighthouse Marine, LLC.[1] Jubilee Sailing, LLC has filed a complaint in intervention against Lighthouse. For simplicity's sake, I will refer to the Rodi Plaintiffs and Jubilee, collectively, as "Plaintiffs." I held a three-day bench trial at the Galveston federal courthouse. Seven witnesses testified live at the trial, and I admitted 189 exhibits into evidence. The trial exhibits included several deposition transcripts, which I have reviewed in full. These findings of fact and conclusions of law address all claims raised by the parties.

### THE PARTIES AND THE CLAIMS

This lawsuit arises from a fire that occurred on October 22, 2022, at Lighthouse's shipyard in Port Bolivar, Texas. The fire, which was set by one or more unknown arsonists who trespassed on Lighthouse's property, resulted in the complete loss of the M/V MS *Monica* and the S/V *Nino*. BSOG owned the *Monica*. Jubilee owned the *Nino*. Following the fire, Rodi obtained title to the *Monica* along with an assignment of BSOG's rights related to that vessel.

Plaintiffs assert claims against Lighthouse for breach of the implied warranty of workmanlike performance, bailment, and negligence. At the close of

---

[1] The Rodi Plaintiffs dismissed Peninsula before the start of trial. *See* Dkt. 76 at 8.

Plaintiffs' case, Lighthouse made an oral Rule 52(c) motion for judgment on partial findings. I took that motion under advisement. Lighthouse later filed a written Rule 52(c) motion. *See* Dkt. 82. I deny that motion, but consider the arguments raised by Lighthouse in that motion in the context of these findings of fact and conclusions of law.

## LEGAL STANDARD

"It is the function of the district court at bench trial to listen to the testimony of each witness, weigh his or her credibility, and make factual findings." *Garr v. Western Sizzler*, No. 00-31240, 2001 WL 1131869, at *1 (5th Cir. Sep. 18, 2001). "[T]he court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). "The court need only make brief, definite, and pertinent findings and conclusions upon contested matters. It need not make findings on stipulated or undisputed facts, although it may have to make a finding if conflicting inferences can be drawn from the undisputed facts." 9C Wright & Miller, Fed. Prac. & Proc. § 2579 (3d ed. 2008) (cleaned up).

## FINDINGS OF FACT

After considering the evidence, the relevant authorities, and the parties' arguments, I make the following findings of fact pursuant to Rule 52(a)(1):

**A.    M/V MS *MONICA***

BSOG owned the *Monica*, an aluminum-hulled crew boat, 134-feet in length at the waterline, 150-feet in length overall, built in 2002. *See* Dkt. 76 at 85; Ex. 117 at 2.[2]

On June 24, 2022, Rodi and BSOG executed a Bareboat Charter Agreement. *See* Ex. 173. Under the terms of the Bareboat Charter Agreement, Rodi paid BSOG

---

[2] All trial exhibits are located on a flash drive placed in an expandable folder in the clerk's office. *See* Dkt. 78.

a monthly fee to charter the *Monica* and enjoyed an option to purchase the *Monica* for $2.2 million. *See id.*

Around August 18, 2022, the *Monica* ran aground on the jetties in Galveston, Texas, sustaining significant damage. *See* Dkt. 76 at 47–48. A few days later, the *Monica* was towed to a shipyard in Port Bolivar, Texas owned and operated by Lighthouse. *See id.* at 49. Based on an August 22, 2022 price sheet Lighthouse provided Rodi, Lighthouse agreed to haul the *Monica* out of the water, block it on land at Lighthouse's yard, provide space for the *Monica* in the shipyard for $500 per day, provide shore power to the vessel, charge an environmental fee, and supply a job supervisor. *See* Ex. 72. Rodi hired D&A Welding, a third-party contractor, to perform most of the repairs on the *Monica*. *See* Dkt. 76 at 52–53. Rodi requested that Lighthouse perform some limited sandblasting and painting of the *Monica*. *See id.* at 104. A Rodi employee, Captain James Stafford, visited the Lighthouse facility five days a week to oversee the repairs made to the *Monica*. *See id.* at 105.

**B.     SV *NINO***

Jubilee purchased the *Nino*, a 98-foot wooden hull sailboat, for $275,000 in 2021. *See* Dkt. 77 at 23; Ex. 119 at 5. Jubilee spent more than $1 million refitting the *Nino*. *See* Dkt. 77 at 67–68; Ex. 169.

During a voyage to Florida in 2022, the *Nino* encountered a severe storm and suffered damage. *See* Dkt. 77 at 82–83. On October 12, 2022, Jubilee brought the *Nino* to Lighthouse's yard for repair and refurbishment. *See id.* at 109. Based on a September 28, 2022 price sheet that Lighthouse provided to Jubilee, Lighthouse agreed to haul the *Nino* out of the water, block it on land at Lighthouse's yard, provide space for the *Nino* in the shipyard for $500 per day, and provide shore power to the vessel. *See* Ex. 155. In total, Lighthouse billed Jubilee $30,688.56 for these services. *See* Ex. 139. Jubilee hired Sonnis Castro, a third-party contractor, to perform the hull repairs at Lighthouse's shipyard. *See* Dkt. 77 at 53.

The *Nino* and the *Monica* were blocked next to each other at Lighthouse's yard, around 35 feet apart. *See* Ex. 125 at 56.

Prior to the October 22, 2022 fire, Marlene Reynaud, a representative of Jubilee, asked Lighthouse's owner, Arthur Guidry, Jr., if she could hire an individual to stay on the *Nino* overnight for security purposes. *See* Dkt. 77 at 63–65. Guidry responded that there was "no possibility" of that happening. *Id*. at 64. Guidry also refused to allow third-party contractors to work after the main gate was closed around 6 p.m. *See id*.

## C.    THE LIGHTHOUSE SHIPYARD ON OCTOBER 22, 2022

The Lighthouse shipyard is approximately 500 feet deep and 1200 feet long. *See* Ex. 125 at 49. It is surrounded on its north and east sides by water. *See* Ex. 118 at 16. There is a main entry gate that is open during business hours to vehicular traffic. *See* Ex. 125 at 48. It closes at approximately 6 p.m. each evening. *See id*. at 52. Security cameras monitor Lighthouse's shipyard. *See id*. at 137. Lighthouse has 20–24 fire extinguishers scattered throughout the shipyard. *See id*. at 73.

On the night of October 22, 2022, Lighthouse had a six-foot fence that went around half the shipyard. *See id*. at 110. Lighthouse did not have a night watchman on the premises. *See id*. at 76. It is undisputed that anyone who wanted to enter the shipyard had unrestricted access. *See id*. at 107. Prior to the fire, Lighthouse had not considered the risk that someone could enter the shipyard and destroy a vessel on site. *See id*. at 104–05. Lighthouse did not have a facility security officer, and never inspected its shipyard to address security issues. *See id*. at 111. Likewise, Lighthouse made no effort to determine shipyard best practices from talking to other shipyard owners. *See id*. at 114. In October 2022, Lighthouse did not have a written fire response or fire safety plan. *See id*. at 67–68.

At trial, John L. Barthelemy, Jr. testified as an expert witness on shipyard operations for the Rodi Plaintiffs. *See* Dkt. 76 at 365–410. Barthelemy worked for almost 50 years in shipyards, having visited roughly a dozen shipyards over his career. *See id*. at 368–69. Barthelemy also prepared a report setting forth his

observations and opinions. *See* Ex. 171. In that report and at trial, Barthelemy noted that (1) no gate or fence prevented him from entering Lighthouse's shipyard and no guard was on duty; (2) the *Monica* and the *Nino* were blocked on land too close to each other, which likely caused the fire to spread; and (3) there was very little fencing around the Lighthouse facility. *See id.* at 2–3; Dkt. 76 at 371–77. Among other things, Barthelemy concluded that: (1) "[f]encing at least 6' tall with barbed wire on top should be provided around the [Lighthouse] facility with the exception of the water front"; (2) "[a] guard at the main gate or entrance should be provided during normal working hours to sign in anyone entering the facility"; (3) "[a] guard should be provided at the main gate or entrance outside of normal working [h]ours. This guard should be required to walk and check the yard every hour"; and (4) although "fire, vandalism and arson are known risks to Shipyards[,] Lighthouse did not take any material efforts to prevent fire, to prepare for fire or to stop fire once it occur[red]." Ex. 171 at 3.

Lighthouse did not present any witnesses at trial to opine on the reasonableness of its actions. Lighthouse did, however, submit an expert report from M.P. Singh of 3D Marine USA, Inc. *See* Ex. 118. In his report, Mr. Singh concluded that "security measures in place at the Lighthouse Marine facility including fencing, gate and security cameras were adequate and reasonable." *Id.* at 13.

### D.    THE OCTOBER 22, 2022 FIRE AND ITS AFTERMATH

At around 8:30 pm on the evening of October 22, 2022, several unidentified individuals entered Lighthouse's yard and set fire to the *Nino*. *See* Exs. 95, 102–03. By the time the fire department arrived at the scene, the *Nino* was fully engulfed in flames. *See* Ex. 102 at LM00041. Prevailing winds caused the fire to spread from the *Nino* to the *Monica*. *See id.* It took firefighters more than six hours to extinguish the fire. *See* Ex. 95 at LM00015. The Galveston County Sheriff's Office concluded that the fire was an arson event. *See* Ex. 103 at LM00061. No other vessels at the shipyard were affected by the fire, and none of Lighthouse's

property (office building, tools, and equipment) was impacted. The *Monica* and the *Nino* were totally destroyed. *See* Dkt. 76 at 57; Dkt. 77 at 65–68.

Guidry, Lighthouse's owner, testified that, based on his review of the video showing the unidentified individuals walking into the Lighthouse yard and setting fire to the *Nino*, it was clear that those individuals had been on the premises before and knew exactly where they were going. *See* Ex. 125 at 112.

In November 2022, Rodi agreed to pay BSOG $2.25 million to acquire title to the *Monica* (despite its status as a total loss) and to acquire any claims BSOG may have against any party arising out of the October 22, 2022 fire. *See* Dkt. 77.

## E. THE VALUE OF THE MS *MONICA* AND *NINO* ON OCTOBER 22, 2022 PRIOR TO THE FIRE

### 1. M/V MS *MONICA*

Two individuals offered their opinions as to the value of the *Monica* on October 22, 2022, before the fire rendered that vessel a total loss. Both of those individuals—Harry L. Stark of Diers and Stark, Inc. and Andrew Minster of Rivers and Gulf Marine Surveyors, Inc.—are marine surveyors and appraisers. *See* Exs. 117 and 170. Both utilized a market value approach to value. *See id.* Minster opined that the fair market value of the *Monica* on October 22, 2022, was $4 million. *See* Ex. 170 at 8. Stark testified that the fair market value of the *Monica* on October 22, 2022, with a valid Coast Guard certificate of inspection was $1.2 million. *See* Ex. 117 at 1. Minster based his opinion of value on the fact that the *Monica* was 150-foot length overall vessel and sought comparable sales that were similar in size to the *Monica*. *See* Ex. 170 at 6. In rendering his opinion of value, Stark incorrectly believed the *Monica* to be a 134-foot length vessel overall. *See* Dkt. 84 at 116. As a result, Stark utilized two sales—the *Miss Jessica Faye* and the *Capt. Stokes*—which he acknowledged at trial were not comparable to the *Monica*. *See id.* at 130. Without those sales, Stark had not one comparable sale to support his valuation. Based on Minster's testimony and his expert report, I find that the value of the *Monica* on October 22, 2022, was $4 million.

### 2.    S/V *NINO*

Joseph Lombardi, an accredited marine surveyor, testified as to the fair market value of the *Nino* on October 22, 2022, immediately before the fire that destroyed the vessel. *See* Dkt. 84 at 47–48. Based on photographs of the *Nino*, Lombardi concluded that the boat was in poor condition. *See id.* at 51–61. The *Nino* suffered from so-called "nail sickness," meaning that the planks were marked with degradation of the fasteners. *See id.* at 51–52. There was also rotted wood planking, rotted transverse frames, and an overwhelming amount of deterioration. *See id.* at 52–57; Ex. 119 at 6. According to Lombardi, "[t]he hull value of [the *Nino*] was seriously diminished over a period of years by a total lack of maintenance performed on her hull bottom planking, frames and interior scantling well prior to her haul-out for survey and repair." Ex. 119 at 7. Due to the poor condition of the *Nino*, Lombardi estimated the market value of the vessel to be between $140,000 and $200,000 on October 22, 2022. *See id.* at 8; Dkt. 84 at 68.

Jubilee did not present any expert testimony concerning the fair market value of the *Nino* on October 22, 2022.

### CONCLUSIONS OF LAW

After considering the evidence, the relevant authorities, and the parties' arguments, I make the following conclusions of law pursuant to Rule 52(a)(1):

This is an admiralty and maritime claim. The court possesses jurisdiction over this matter pursuant to its admiralty and maritime jurisdiction. *See* 28 U.S.C. § 1333. This court also has supplemental jurisdiction over the parties' state law claims. *See* 28 U.S.C. § 1367.

Plaintiffs bring causes of action for the implied warranty of workmanlike performance, bailment, and negligence. I will address each claim for affirmative relief raised by Plaintiffs, and then tackle the issue of damages.

7

### A.   PLAINTIFFS' CAUSES OF ACTION

#### 1.   *Implied Warranty of Workmanlike Performance*

Plaintiffs allege Lighthouse breached the implied warranty of workmanship present in all maritime service contracts. *See* Dkt. 15 at 3; Dkt. 22 at 3.

"To recover from a contractor for breach of an implied warranty of workmanlike performance, a shipowner must prove that the contractor breached the warranty, and that the breach proximately caused the injury." *Butterfly Transp. Corp. v. Bertucci Indus. Servs., LLC*, 351 F. App'x 855, 858 (5th Cir. 2009). "[S]hore-based contractors who go aboard a vessel by the owner's arrangement or by his consent to perform service for the ship's benefit impliedly warrant to the shipowner that they will accomplish their task in a workmanlike manner." *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 301 (5th Cir. 1973). The implied warranty of workmanlike performance is breached when a contractor fails to perform its obligations "properly and safely." *Id.* (quotation omitted). The contractor is, therefore, "obligated to properly perform 'the essence' or 'inescapable elements' of its contract with the Owners." *Butterfly Transp. Corp.*, 351 F. App'x at 858. In determining whether the "essence" of the contract was performed, I must consider "*both* a general standard of reasonable care and the contract's specific obligations." *Id.*

Lighthouse argues that the implied warranty of workmanlike performance claim fails because Plaintiffs "did not present sufficient evidence that the contractual services performed by Lighthouse were completed improperly, unsafely, unreasonably, or that Lighthouse's performance of these services proximately caused the fire or resulting loss." Dkt. 87 at 20. This argument does not persuade me. It is certainly true that Lighthouse performed no repair work on the *Nino*. It is also true that the limited sandblasting and painting services Lighthouse performed on the *Monica* did not cause or contribute to the fire that destroyed the vessels. But that is irrelevant. Plaintiffs' implied warranty of

workmanlike performance claim is based on Lighthouse's contractual obligation to provide space for the *Monica* and the *Nino* at the Lighthouse yard.

Plaintiffs point out that Lighthouse charged Rodi and Jubilee each $500 a day to provide space in its yard for the *Monica* and the *Nino*, respectively. The "essence" of that agreement is clear: Lighthouse agreed not only to provide space for the vessels, but to also provide a safe area for the vessels. Indeed, it would make no sense for Lighthouse to charge $500 a day to store the vessels without an implied promise that the location where the vessels would be placed would be safe. Lighthouse insists that there is no authority that holding "that a vessel owner's payment for space at a repair yard automatically includes an implied guarantee from the yard owner that the vessel will be safeguarded against *any* potential threat." Dkt. 87 at 22. Although that might be true, it is not a reason to reject Plaintiffs' implied warranty of workmanlike performance claim.

"Though the implied warranty of workmanlike performance is a legal standard, the question of what is required in a workmanlike performance is necessarily a factual question that naturally varies from case to case based on the scope and nature of the service being undertaken." *N. Ins. Co. of NY v. Point Judith Marina, LLC*, 579 F.3d 61, 68 (1st Cir. 2009). Here, the evidence is overwhelming: although Rodi and Jubilee paid for space to store vessels at Lighthouse's shipyard, Lighthouse took no security measures to protect those vessels. None. Because there was no night watchman and only a 50-percent-fenced yard, anyone could freely enter the Lighthouse facility at any time. That is exactly what happened on October 22, 2022, when several unidentified individuals accessed the property and set fire to the *Nino*, which then spread to the *Monica*. I find that Lighthouse breached the standard of reasonable care by failing to implement any meaningful security measures, fire prevention policies, or fire response plans. Lighthouse further breached the standard of reasonable care by rebuffing Jubilee's efforts to have someone remain at the site overnight to oversee the *Nino*. These breaches proximately resulted in the destruction of the *Nino* and the *Monica*.

### 2.   *Bailment*

Plaintiffs also bring a bailment claim. *See* Dkt. 15 at 3; Dkt. 22 at 3. Rodi brings a bailment claim under both Texas law and maritime law. *See* Dkt. 22. Jubilee brings a bailment claim solely under general maritime principles. *See* Dkt. 15. Ultimately, this difference is unimportant for liability purposes because the standard for bailment under maritime law and Texas law are functionally identical. *Compare Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 830 (5th Cir. 2014), *with Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 463 (Tex. App.—Dallas 2006, pet. denied).

The Fifth Circuit has defined a bailment as:

> A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.

*T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) (quoting Black's Law Dictionary 129 (5th ed. 1979)). In Texas, "[a] bailment relationship generally requires: (1) a contract, either express or implied; (2) delivery of property to the bailee; and (3) acceptance of the property by the bailee." *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, 921 F. Supp. 2d 697, 726 (S.D. Tex. 2013).

"Bailment law governs where, as here, a vessel is left in the shipyard's custody for repairs." *Nat'l Liab. & Fire Ins. Co.*, 756 F.3d at 830; *see also Buntin v. Fletchas*, 257 F.2d 512, 513 (5th Cir. 1958) ("The law of bailment is applicable in suits for damages to a ship that has been left with another for the purpose of repairs."); *Stegemann v. Miami Beach Boat Slips*, 213 F.2d 561, 564 (5th Cir. 1954) ("When a vessel is placed at a [w]harf or dock for storage and/or repairs, a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock."). The Fifth Circuit has held that when the delivery of the vessel is

10

not complete, "as when the owner remains with the thing or has an independent agent or employee responsible for it or for certain aspects of its care, there is a corresponding limitation on the bailment and the duty of the bailee." *Stegemann*, 213 F.2d at 565. "A limited bailment occurs when exclusivity of control over the bailed object is compromised." *Nat'l Liab. & Fire Ins. Co.*, 756 F.3d at 831; *see also Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322–23 (5th Cir.1962) ("[W]here the owner maintains some dominion over the vessel, . . . there is a corresponding limitation on the duty of the bailee."). "[T]he bailment obligation to redeliver under the conversion principle is modified to the extent the owner reserves–or from the bailee's viewpoint, appears to reserve–some control over the activity which operationally inflicts the harm." *Isbell Enters., Inc. v. Citizens Cas. Co.*, 431 F.2d 409, 416 (5th Cir. 1970).

Noting that Plaintiffs' representatives and third-party contractors had access to—and performed work on—the *Monica* and *Nino* during daylight hours, Lighthouse insists that no bailment relationship existed between Plaintiffs and Lighthouse. In support of this argument, Lighthouse cites *Thyssen Steel v. M/V Kavo Yerakas*, 50 F.3d 1349 (5th Cir. 1999), for the proposition that "[u]nder general maritime law, bailment does not arise unless delivery to the bailee is complete and the bailee has exclusive possession of the bailed property, even as against the property owner." Dkt. 87 at 24. The authority cited by *Thyssen* is a passage from *T.N.T. Marine*, which another court has described as "somewhat problematic." *Sneed Shipbuilding, Inc. v. M/V Rachel D. Charpentier*, No. 1:06-cv-246, 2008 WL 11449210, at *11 (E.D. Tex. Nov. 17, 2008).

> In *T.N.T. Marine*, the Fifth Circuit wrote that "[i]t has been stated that an admiralty bailment does not arise unless the delivery to the bailee is complete and he has exclusive right to possession of the bailed property, even as against the owner." Yet in the very next sentence, the court cited *Stegemann's* notion of a limited bailment, writing that "[a] bailee's duties are limited when the owner or his agent or employee remains with the vessel or has access to it." Candidly, it is difficult to square these two statements. The second

11

suggests the possibility of a limited bailment if the vessel owner has access; while the first suggests that the existence of an admiralty bailment is an all or nothing proposition. Under the first sentence, if the vessel owner had access to the vessel, there would be no bailment at all–not a limited bailment.

     *T.N.T.'s* reference to *Stegemann* suggests that the Fifth Circuit did not intend to overturn its precedent (established in *Stegemann* and *Isbell Enterprises*) that a shipyard's non-exclusive right to possession of a vessel *limits* (rather than precludes) its bailment obligations.

*Id.* (cleaned up). I wholeheartedly agree with this viewpoint. I would also add that the Fifth Circuit has, since issuing *Thyssen* and *T.N.T. Marine*, reiterated that the limited bailment concept is alive and well. *See Nat'l Liab. & Fire Ins. Co.*, 756 F.3d at 831 n.8 (collecting cases).

Based on the facts presented in this case, I find that a limited bailment relationship existed between Lighthouse and Plaintiffs. It is uncontested that Lighthouse was the only party with control over the *Monica* and the *Nino* when the fire broke out around 8:30 p.m. on October 22, 2022. The shipyard had closed hours earlier. The presence of Plaintiffs' representatives and third-party contractors at the Lighthouse's facility during daylight hours on October 22, 2022, did not affect Lighthouse's exclusive control over the *Monica* and the *Nino*, any movements within the shipyard, or the safety and security of the vessels after the shipyard was closed. The testimony at trial firmly established that Lighthouse accepted responsibility for and was in complete control of protecting the vessels in the shipyard during the period when the fire occurred. Indeed, as already noted, Lighthouse rebuffed Jubilee's efforts to have an independent watchman present at the *Nino* at night.

Lighthouse and Plaintiffs entered contracts for the hauling out, blocking, and storage of the *Monica* and the *Nino*. Jubilee delivered the *Nino* to Lighthouse for this purpose, and Rodi delivered the *Monica* to Lighthouse for this purpose.

Lighthouse accepted the delivery. The parties agreed that the *Monica* and the *Nino* would be stored and returned to Plaintiffs. This did not happen.

"Bailment imposes a duty of ordinary care upon the bailee." *Nat'l Liab. & Fire Ins. Co.*, 756 F.3d at 830. While the "burden of proof of negligence is on the bailor," by showing that the "vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence; and the duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care." *Stegemann*, 213 F.2d at 564; *see also Frichelle Ltd. v. Master Marine, Inc.*, 99 F.Supp.2d 1337, 1345 (S.D. Al. 2000) ("The significance of a bailment is that it allows the plaintiff to raise a presumption of negligence that the defendant must then rebut.").

Plaintiffs have made out a prima facie case of negligence. Even if I credit Lighthouse with presenting sufficient evidence to rebut a presumption of negligence, all that does is fold the bailment claim into a claim for ordinary negligence. *See Sisung*, 303 F.2d at 322.

Considering the complete record before me, I find that Lighthouse was negligent. Lighthouse did not act as a reasonably prudent shipyard owner would under the same or similar circumstances. The October 22, 2022 fire was foreseeable; Lighthouse was responsible to take steps to prevent the fire; and Lighthouse failed to do so. "While a marina is not an insurer for the boat owner who stores his boat there, its duty of ordinary and reasonable care requires that it take some measures, such as private security service, to protect the boats it stores." *Snyder v. Four Winds Sailboat Ctr., Ltd.*, 701 F.2d 251, 253 (2d Cir. 1983); *see also Fireman's Fund Am. Ins. Co. v. Captain Fowler's Marina, Inc.*, 343 F. Supp. 347, 349 (D. Mass. 1971) (finding bailor-bailee relationship existed even though owner had right to access the boat when a marina "was authorized to haul the boat, place it in a location for storage, and return it to the owner at a later date"). Lighthouse's negligence proximately resulted in the destruction of the *Nino* and the *Monica*.

### 3.     *Negligence*

Plaintiffs also bring separate causes of action for negligence. *See* Dkt. 15 at 3; Dkt. 22 at 3. In their proposed findings of fact and conclusions of law, Plaintiffs encourage me not to address the negligence cause of action because negligence is duplicative of the implied warranty of workmanlike performance and bailment claims. *See* Dkt. 88 at 39; Dkt. 89 at 20. I will follow that guidance, and I will not address Plaintiffs' negligence claims.[3]

### B.     PLAINTIFFS' DAMAGES

Having determined that Plaintiffs are entitled to prevail on their implied warranty of workmanlike performance and bailment claims, I must now address the proper amount of damages that Plaintiffs should be awarded.

"A vessel is considered a constructive total loss when the cost of repairs is greater than the fair market value of the vessel immediately before the casualty." *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 491 (5th Cir. 1986). "In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction." *Standard Oil Co. of N.J. v. S. Pac. Co.*, 268 U.S. 146, 155 (1925). Fair market value is "the sum which, considering all the circumstances, probably could have been obtained for [the

---

[3] The unknown arsonists who caused the October 22, 2022 fire have been designated as responsible third parties under Texas Civil Practice & Remedies Code § 33.004(j). *See Rodi Marine, LLC v. Lighthouse Marine, LLC*, 729 F. Supp. 3d 696, 701 (S.D. Tex. 2024). "Chapter 33 of the Texas Civil Practice and Remedies Code apportions responsibility among those responsible for damages in 'any cause of action based on tort.'" *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 702 (Tex. 2008) (quoting Tex. Civ. Prac. & Rem. Code § 33.002(a)(1)). That statutory framework is inapplicable to each cause of action for which Plaintiffs presently seek recovery. The implied warranty of workmanlike performance claim is not a tort-based claim. The federal bailment claim does not involve a Texas tort. *See Nunez v. City of Corpus Christi*, No. 2:12–cv–00092, 2013 WL 164045, at *1 (S.D. Tex. Jan. 14, 2013) (finding that excessive force claims are federal claims, not Texas torts and hence do not implicate Chapter 33). And, finally, the state law bailment claim raised here is contract based and thus does not implicate Chapter 33's proportionate responsibility scheme. Although Chapter 33 would clearly apply to a state-law negligence claim, Plaintiffs do not ask me to award them damages on such a theory.

vessel] . . . from fair negotiations between an owner willing to sell and a purchaser desiring to buy." *Id.* at 155–56.

The recovery of loss-of-use damages depends on whether relief is sought under maritime law or Texas law. Under maritime law, "[d]amages for loss of use *may not* be awarded when the vessel is a constructive total loss." *Ryan Walsh Stevedoring*, 792 F.2d at 491 (emphasis added). Under Texas law, property owners *may* recover reasonable loss of use damages in the event of a total loss of property. *See J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 677 (Tex. 2016).

> Permitting loss-of-use damages in total-destruction cases, however, is not a license for unrestrained raids on defendants' coffers. As with all consequential damages, the availability of loss-of-use damages is necessarily circumscribed by commonsense rules. To begin with, the damages claimed may not be too remote. This is not to say they must be "the usual result of the wrong," but they must be foreseeable and directly traceable to the tortious act. The damages also must not be speculative. Although mathematical exactness is not required, the evidence offered must rise above the level of pure conjecture. Moreover, the damages may not be awarded for an unreasonably long period of lost use. Whether framed as a duty of mitigation or a doctrine of avoidable consequences, the principle is the same: A plaintiff may not recover loss-of-use damages for a period longer than that reasonably needed to replace the personal property. That principle compels a plaintiff's diligence in remedying his loss and deters an opportunistic plaintiff from dilly-dallying at the expense of the defendant. After all, the role of actual damages is to place the plaintiff in his *rightful* position, not the position he *wishes* to acquire.

*Id.* (cleaned up).

Because the *Monica* and the *Nino* were total losses, Plaintiffs are entitled to the fair market value of their respective vessels. Based on the expert testimony provided, I find that the fair market value of the *Monica* on October 22, 2022, was $4 million, and the fair market value of the *Nino* on the same date was $200,000.

Turning to loss-of-use damages, Rodi seeks $5,543,503 for five years of loss-of-use damages.[4] *See* Dkt. 88 at 44; Ex. 85. I will not award these damages. The

---

[4] In its proposed findings of fact and conclusions of law, Jubilee asks for loss-of-use damages under Texas law. *See* Dkt. 89 at 22–23. This request fails because Jubilee's

loss-of-use damages sought by Rodi are too speculative to be recoverable. Rodi's loss-of-use damage model assumes that Talos Energy would charter the *Monica* in the future. *See* Dkt. 76 at 61. Although Rodi had a long-standing relationship with Talos, there was no long-term charter agreement in place that obligated Talos to utilize the *Monica*. *See id.* at 263–64. Rodi's expectation that the *Monica* would perform work for Talos well into the future is not enough to justify five years of loss-of-use damages. *See id.* at 38–39. It is telling—and concerning—that throughout this litigation, Rodi's loss-of-use damages have fluctuated from an 18-month time period, a three-year time period, and a five-year time period. *See id.* at 157. To the extent Talos chose to use the *Monica*, Talos could have stopped using the *Monica* at any time for any reason. *See id.* at 263. Awarding damages for the loss-of-use of the *Monica* would amount to an impermissible "raid[] on [Lighthouse's] coffers." *J & D Towing*, 478 S.W.3d at 677. Rodi's damages for the destruction of the *Monica* are limited to the value of the vessel, with interest. On a related note, it concerns me that Rodi chose not to purchase a replacement vessel for the *Monica* to try to recoup its alleged loss-of-use damages. Given that Rodi elected not to mitigate potential losses of income, I will not award loss-of-use damages here.

I also will not award the Rodi Plaintiffs or Jubilee attorneys' fees. "The general rule in admiralty is that attorneys' fees are not recoverable by the prevailing party." *Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1011 (5th Cir. 1984).

## CONCLUSION

For the reasons discussed above, Plaintiffs are entitled to judgment in their favor. The Rodi Plaintiffs are entitled to damages of $4 million, plus interest. Jubilee is entitled to damages of $200,000, plus interest.

---

claims are brought entirely under maritime law. *See* Dkt. 15. As already explained, loss-of-use damages are not available for total losses under maritime law. Even if Jubilee was legally entitled to recover loss-of-use damages, the loss-of-use damages that Jubilee seeks in this case are too remote, too uncertain, and purely conjectural.

16

The parties are ordered to confer and file a proposed final judgment (agreed to as to form only) by Thursday, April 2, 2026. If the parties cannot agree on the form a final judgment should take, each side should submit their own proposed final judgment by Thursday, April 2, 2026, with a cover letter explaining why its proposed final judgment is proper.

SIGNED this 27 day of March 2026.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

17